# UNITED STATES *v.* ROCK ROYAL CO-OPERATIVE, INC. ET AL.*

No. 771. Argued April 24, 25, 1939.—Decided June 5, 1939.

---

*Together with No. 826, *Noyes, Commissioner of Agriculture and Markets of the State of New York,* v. *Rock Royal Co-operative, Inc. et al.;* No. 827, *Dairymen's League Cooperative Assn., Inc.* v. *Rock Royal Co-operative, Inc. et al.;* and No. 828, *Metropolitan Co-operative Milk Producers Bargaining Agency, Inc.* v. *Rock Royal Co-operative, Inc. et al.,* also on appeals from the District Court of the United States for the Northern District of New York.

534

536

538

*Solicitor General Jackson,* with whom *Assistant Attorney General Arnold,* and *Messrs. John S. L. Yost, Charles J. McCarthy, Robert K. McConnaughey,* and *Mastin G. White* were on the brief of the United States in No. 771, for appellants.

*Messrs. Milo R. Kniffen* and *Louis S. Wallach* were on a brief for appellant in No. 826; *Messrs. Seward A. Miller* and *Edward Schoeneck* were on a brief for appellant in No. 827; and *Messrs. Edmund F. Cooke* and *John E. Larson* were on a brief for appellant in No. 828.

*Mr. Leonard Acker* for the Central New York Co-operative Assn., and *Mr. Willard R. Pratt* for the Rock Royal Co-operative, Inc., et al., appellees.

By leave of Court, briefs of *amici curiae* were filed in No. 771 by *Messrs. Claude T. Reno,* Attorney General of Pennsylvania, and *Harry Polikoff,* Deputy Attorney General, on behalf of that State, urging the validity of Order No. 27; and by *Mr. Henry S. Manley* on behalf of the New York State Guernsey Breeders Co-operative, Inc. et al.

Mr. Justice Reed delivered the opinion of the Court.

These appeals involve the validity of Order No. 27 of the Secretary of Agriculture, issued under the Agricul-

tural Marketing Agreement Act of 1937,[1] regulating the handling of milk in the New York metropolitan area.

On October 27, 1938, the United States of America filed a complaint against the Rock Royal Co-operative, Inc., the Central New York Coöperative Association, Inc., and Schuyler Junction New York Milk Shed Coöperative, Inc., seeking a mandatory injunction requiring the defendants and their representatives to comply with the provisions of the Order. On November 26, 1938, a similar action was filed in the same court against the Jetter Dairy Company, Inc. On December 2 these causes were consolidated. The original proceedings had sought relief not only for violations of the Order of the Secretary of Agriculture but also, if the court should find that the defendants or any of them were not subject to that Order, for violation of Official Order No. 126 issued by the Commissioner of Agriculture and Markets of the State of New York. The two orders are *in pari materia*, one covering milk moving in or directly burdening, obstructing or affecting interstate commerce and the other [2] covering milk in intrastate commerce. Each defendant is a dealer handling milk moving in interstate commerce. On December 15, Holton V. Noyes, as Commissioner of Agriculture and Markets of the State of New York, was permitted to intervene as a party plaintiff in the consolidated action. He sought an injunction commanding the defendants and their representatives to comply with Order No. 126 or, should it be determined that their milk was not subject to this Order, to comply with the Order of the Secretary of Agriculture.

In their answers, the defendants pleaded certain affirmative defenses, setting up the invalidity of Order No. 27 because of improper efforts to secure its adoption.

---

[1] Act of June 3, 1937, 50 Stat. 246.

[2] As authorized by N. Y. Laws 1937, c. 383. See *Noyes* v. *Erie & Wyoming Farmers Co-op.*, 170 Misc. 42; 10 N. Y. S. 2d 114.

Broadly speaking, these defenses were based upon erroneous representations alleged to have been made by officials and by certain private organizations to bring about the approval of the Order and upon an alleged conspiracy of the same private organizations to create a monopoly by means of the Order. The motion to strike these defenses having been overruled, the Dairymen's League Coöperative Association, hereinafter called the League, and the Metropolitan Coöperative Milk Producers Bargaining Agency, Inc., hereinafter called the Agency, were permitted to intervene to combat them.

The answers also challenged the two orders and the Act as contrary to the Fifth and Fourteenth Amendments to the Constitution and the Act as involving improper delegation of legislative power. The Central New York Coöperative Association denied the power of the Congress to enact the legislation under the Commerce Clause and set up as a further defense that it was not subject to either order.

After a hearing upon the merits, the District Court dismissed the complaints. The state order was eliminated from consideration on the understanding, not questioned here, that the milk of all four defendants is covered by the Federal Order, if valid. It was further held that §§ 8c (5) (B) (ii) and 8c (5) (F) of the Act violate the due process clause of the Fifth Amendment, that the Order is discriminatory and takes property without compensation, that approval of the producers was secured by unlawful misrepresentation and coercion and that important provisions of the Order, authorizing payments to coöperative and proprietary handlers, have no basis in the Act. *United States* v. *Rock Royal Co-operative*, 26 F. Supp. 534, 548, 550; 544, 545, 553. As the unconstitutionality of certain sections of an Act of Congress was one ground of the decision an appeal was allowed directly to this Court.[3]

---

[3] § 2, Act of Aug. 24, 1937, 50 Stat. 752; 28 U. S. C. § 349a.

*The Statute.*[4] The controversy revolves almost entirely around Order No. 27. Back of the Order is the statute under which it was issued, the Agricultural Marketing Agreement Act of 1937, which reënacted and amended certain provisions of the Agricultural Adjustment Act.[5]

[4] Pertinent portions of the Act are as follows:

Act, § 8c (1). "The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. . . ."

(2) "Orders issued pursuant to this section shall be applicable only to the following agricultural commodities and the products thereof (except products of naval stores), or to any regional, or market classification of any such commodity or product: Milk, fruits (including pecans and walnuts but not including apples and not including fruits, other than olives, for canning), tobacco, vegetables (not including vegetables, other than asparagus, for canning), soybeans and naval stores as included in the Naval Stores Act and standards established thereunder (including refined or partially refined oleoresin)."

(3) "Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this title with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of and an opportunity for a hearing upon a proposed order."

(4) "After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this title with respect to such commodity."

(5) "In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method

(Footnote 4 continues on next page.)

[5] Act of May 12, 1933, 48 Stat. 31, as amended Aug. 24, 1935, 49 Stat. 750.

As its name implies, it was aimed at assisting in the marketing of agricultural commodities.

By § 1 it is declared that "the disruption of the orderly exchange of commodities in interstate commerce impairs

for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.

"(B) Providing:

"(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered;

subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk during a representative period of time.

"(C) In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection (5), providing a method for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) hereof.

"(F) Nothing contained in this subsection (5) is intended or shall be construed to prevent a cooperative marketing association qualified under the provisions of the Act of Congress of February 18, 1922, as amended, known as the 'Capper-Volstead Act', engaged in making collective sales or marketing of milk or its products for the producers thereof, from blending the net proceeds of all its sales in

the purchasing power of farmers" thus destroying the value of agricultural assets to the detriment of the national public interest. This interference is declared to "burden and obstruct the normal channels of interstate commerce."

---

all markets in all use classifications, and making distribution thereof to its producers in accordance with the contract between the association and its producers: *Provided,* That it shall not sell milk or its products to any handler for use or consumption in any market at prices less than the prices fixed pursuant to paragraph (A) of this subsection (5) for such milk.

"(G) No marketing agreement· or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."

[N. B. (6) relates to products other than milk.]

(7) "In the case of the agricultural commodities and the products thereof specified in subsection (2) orders shall contain one or more of the following terms and conditions:

"(A) Prohibiting unfair methods of competition and unfair trade practices in the handling thereof.

"(B) Providing that (except for milk and cream to be sold for consumption in fluid form) such commodity or product thereof, or any grade, size, or quality thereof shall be sold by the handlers thereof only at prices filed by such handlers in the manner provided in such order.

"(C) Providing for the selection by the Secretary of Agriculture, or a method for the selection, of an agency or agencies and defining their powers and duties, which shall include only the powers:

"(i) To administer such order in accordance with its terms and provisions;

"(ii) To make rules and regulations to effectuate the terms and provisions of such order;

"(iii) To receive, investigate, and report to the Secretary of Agriculture complaints of violations of such order; and·

"(iv) To recommend to the Secretary of Agriculture amendments to such order.

No person acting as a member of an agency established pursuant to this paragraph (C) shall be deemed to be acting in an official

By § 2 it is declared to be the policy of Congress, through the exercise of the powers conferred upon the Secretary of Agriculture, "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities

capacity, within the meaning of section 10 (g) of this title, unless such person receives compensation for his personal services from funds of the United States.

"(D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6), and (7) and necessary to effectuate the other provisions of such order."

(18) "The Secretary of Agriculture, prior to prescribing any term in any marketing agreement or order, or amendment thereto, relating to milk or its products, if such term is to fix minimum prices to be paid to producers or associations of producers, or prior to modifying the price fixed in any such term, shall ascertain, in accordance with section 2 and section 8e, the prices that will give such commodities a purchasing power equivalent to their purchasing power during the base period. The level of prices which it is declared to be the policy of Congress to establish in section 2 and section 8e shall, for the purposes of such agreement, order, or amendment, be such level as will reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand, for milk or its products in the marketing area to which the contemplated marketing agreement, order, or amendment relates. Whenever the Secretary finds, upon the basis of the evidence adduced at the hearing required by section 8b or 8c, as the case may be, that the prices that will give such commodities a purchasing power equivalent to their purchasing power during the base period as determined pursuant to section 2 and section 8e are not reasonable in view of the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk and its products in the marketing area to which the contemplated agreement, order, or amendment relates, he shall fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest. Thereafter, as the Secretary finds necessary on account of changed circumstances, he shall, after due notice and opportunity for hearing, make adjustments in such prices."

a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period. . . ."

Under § 2 of the Act, the base period for agricultural commodities, except tobacco and potatoes, is fixed at the pre-war period of August, 1909, to July, 1914. Where the purchasing power during the base period cannot be satisfactorily determined from available statistics within the Department of Agriculture, the Secretary is authorized to take as the base period from August, 1919, to July, 1929, or a portion thereof. § 8e. In prescribing minimum prices for milk the statute authorizes the Secretary to fix minimum prices without restriction to the purchasing power during the base period so as to reflect the prices of available supplies of feed and other economic conditions, if he finds after a hearing that minimum prices with a base period purchasing power are unreasonable. § 8c (18).

Section 8a (6) gives jurisdiction to the district courts of the United States to enforce and to prevent and restrain any person from violating any of the orders, regulations or agreements under its provisions.

Section 8b authorizes the Secretary of Agriculture to enter into marketing agreements with the producers and others engaged in the handling of agricultural commodities in or affecting interstate commerce. These agreements may be for all agricultural commodities and their products, are entirely voluntary and may cover the handling of the commodity by any person engaged in the various operations of processing or distribution. Agreements are involved only incidentally in this proceeding.

Section 8c provides for a use of orders, instead of agreements, in certain situations. These orders apply only to specified commodities, including milk.[6] They are to be entered only when the Secretary of Agriculture has rea-

---

[6] § 8c (2).

son to believe that the issuance of an order will tend to effectuate the declared policy of the Act with respect to any commodity or product thereof, and after notice and an opportunity for hearing. It is necessary also for the Secretary of Agriculture to set forth in such order a finding upon the evidence introduced at the hearing that the issuance of the Order and the terms and conditions thereof will tend to effectuate the declared policy.[7] When, as here, the commodity is milk, the Act requires[8] that the Order contain one or more of terms specified in § 8c (5) and no others, except certain terms common to all orders and set out in § 8c (7). These terms, as used in the Order under examination, will be referred to later. Orders may only be issued[9] after hearing upon a marketing agreement which regulates the handling of the commodity in the same manner as the order. Without special determination of the Secretary of Agriculture and approval of the President, orders are not to become effective unless approved by handlers as required by the Act.[10]

Notwithstanding the refusal or failure of handlers to sign a marketing agreement relating to such commodity, the Secretary of Agriculture, with the approval of the President, may issue an order without the adoption of an agreement if he determines that the refusal or failure of the handlers to sign a marketing agreement tends to prevent the effectuation of the declared policy with respect to the commodity and that the issuance of the order is the only practical means of advancing the interest of the producers. In such a case the order must be approved or favored by two-thirds of the producers in number or volume who have been engaged, during a representative period, in the production for market of the

---

[7] § 8c (4).

[8] § 8c (5).

[9] § 8c (10).

[10] § 8c (8).

commodity within the production area or two-thirds of those engaged in the production of the commodity for sale in the marketing area specified in the marketing agreement or order. § 8c (9). Section 8c (19) authorizes a referendum to determine whether the issuance of the order is approved by the producers. Section 8c (12) provides that the Secretary shall consider the approval or disapproval by any coöperative association as the approval or disapproval of the producers who are members, stockholders or patrons of the coöperative association.

Section 8c (15) provides for administrative review by the Secretary on petition of a handler objecting to any provision as not in accordance with law and seeking a modification or exemption therefrom. By (15) (B) the district courts have jurisdiction to review such ruling.

*The Problem.*—In accordance with the provisions of the Act the Secretary of Agriculture, before promulgating Order No. 27, conducted public hearings attended by handlers, producers and consumers of milk and their representatives throughout the milkshed. No defendant, however, was represented. These hearings followed the presentation by the Agency to the Secretary and to the Commissioner of a proposed marketing agreement and order regulating the handling of milk in the New York marketing area with a request for action under the federal and New York statutes. The hearings were jointly held by the federal and state governments. The coöperation of the two governments was the culmination of a course of investigation and legislation which had continued over many years. The problem from the standpoint of New York was fully considered and the results set out in the Report of 1933 of the Joint Legislative Committee to Investigate the Milk Industry. This investigation was followed by the creation of the Milk Control Board with broad powers to regulate the dairy business of the state. This board had power to fix prices to

be paid to producers and to be charged to consumers.[11] A later New York act, the Rogers-Allen Act,[12] authorized the state commissioner to coöperate with the federal authorities acting under the present Marketing Agreement Act, and to issue orders supplementary to those of the Federal Government to be carried out under joint administration.

The problems concerned with the maintenance and distribution of an adequate supply of milk in metropolitan centers are well understood by producers and handlers. In the milkshed and marketing area of metropolitan New York these problems are peculiarly acute.[13] It is generally recognized that the chief cause of fluctuating prices and supplies is the existence of a normal surplus which is necessary to furnish an adequate amount for peak periods of consumption. This results in an excess of production during the troughs of demand. As milk is highly perishable, a fertile field for the growth of bacteria, and yet an essential item of diet, it is most desirable to have an adequate production under close sanitary supervision to meet the constantly varying needs. The sale of milk in metropolitan New York is ringed around with requirements of the health departments to assure the purity of the supply. Only farms with equipment approved by the health authorities of the marketing area and operated in accordance with their requirements are permitted to market their milk. More than sixty thousand dairies located in the states of New York, Connecticut, Massachusetts, Maryland, New Jersey, Pennsylvania and Vermont hold certificates

---

[11] Certain of these powers were upheld in *Nebbia* v. *New York*, 291 U. S. 502.

[12] N. Y. Laws 1937, c. 383.

[13] *Nebbia* v. *New York*, 291 U. S. 502; *Baldwin* v. *Seelig*, 294 U. S. 511; *Hegeman Farms Corp.* v. *Baldwin*, 293 U. S. 163.

of inspection and approval from the Department of Health of the City of New York. More than five hundred receiving plants similarly scattered have been approved for the receiving and shipping of grades A and B milk. Since all milk produced cannot find a ready market as fluid milk in flush periods, the surplus must move into cream, butter, cheese, milk powder and other more or less nonperishable products. Since these manufactures are in competition with all similar dairy products, the prices for the milk absorbed into manufacturing processes must necessarily meet the competition of low-cost production areas far removed from the metropolitan centers. The market for fluid milk for use as a food beverage is the most profitable to the producer. Consequently, all producers strive for the fluid milk market. It is obvious that the marketing of fluid milk in New York has contacts at least with the entire national dairy industry. The approval of dairies by the Department of Health of New York City, as a condition for the sale of their fluid milk in the metropolitan area, isolates from this general competition a well recognized segment of the entire industry. Since these producers are numerous enough to keep up a volume of fluid milk for New York distribution beyond ordinary requirements, cut-throat competition even among them would threaten the quality and in the end the quantity of fluid milk deemed suitable for New York consumption. Students of the problem generally have apparently recognized a fair division among producers of the fluid milk market and utilization of the rest of the available supply in other dairy staples as an appropriate method of attack for its solution. Order No. 27 was an attempt to make effective such an arrangement under the authority of the Agricultural Marketing Agreement Act.

*Order No. 27.*[14] The Secretary of Agriculture found that two-thirds of the milk produced for the New York marketing area actually moves in interstate commerce and that the remaining one-third produced within the

---

[14] Pertinent portions are as follows:

Order, Article VI, § 1. "Net Pool Obligation of Handlers.—The net pool obligation of any handler for milk received from producers during each month shall be a sum of money computed for such month as follows:

"1. Determine the total quantity of milk in each class at each plant;

"2. Subtract from the quantity of milk in each class the quantity of such milk received from other plants or from other handlers;

"3. Subtract pro rata out of each class the quantity of milk received from the handler's own farm;

"4. Subtract from the remaining quantity of milk in each class, the quantity of each to which the prices in section 1 of Article IV do not apply, which result shall be known as the 'net pooled milk' in each class.

"5. Multiply the total quantity of net pooled milk in each class, at all plants of the handler combined, by the respective class prices set forth in section 1 of article IV and add together the resulting sums;

.     .    .  .      .     .      .       .

"8. Deduct 20 cents per hundredweight for all net pooled milk received from producers at plants in the counties or portions of counties listed below in this section. The result thus obtained shall be known as the 'handler's net pool obligation.' "

Counties—*New Jersey:* Hunterdon, Somerset, Essex, Union, Morris, Warren, Sussex, Passaic. *New York:* Columbia, Dutchess, Nassau, Orange, Putnam, Suffolk, Westchester. *Connecticut:* Litchfield. *Massachusetts:* Berkshire. *Towns in Ulster County, New York:* Marbletown, Hurley, Kingstown, Ulster, Rosendale, Esopus, New Paltz, Lloyd, Gardiner, Plattekill, Marlborough, Shawangunk.

"SEC. 2. Computation of the Uniform Price.—The market administrator shall on or before the 14th day of each month, audit for mathematical correctness and obvious errors the final report submitted for the preceding month by each handler and, on the 14th day of such month, compute from all of such corrected reports the uniform price in the following manner:

"1. Combine into one total the net pool obligations of all handlers;

State of New York was "physically and inextricably intermingled" with the interstate milk; that all was handled either in the current of interstate commerce or so as to affect, burden and obstruct such interstate commerce in

"2. Subtract the total of payments required to be made for such month by section 5 of article VII and the total of payments claimed pursuant to section 6 of article VII;

"3. Add the amount of cash in the producer settlement fund;

"4. Divide the result by the total quantity of milk represented in the sum obtained pursuant to paragraph 1 of this section; and

"5. Subtract not less than 4 cents nor more than 5 cents to provide against the contingency of errors in reports and payments or of delinquencies in payments by handlers. This result shall be known as the uniform price for such month for milk containing 3.5 percent butterfat received from producers at plants in the 201–210 mile zone."

Article VII, § 1. "Time of Payment.—On or before the 25th day of each month each handler. which is not a cooperative association of producers shall make payment to each producer for all milk delivered by such producer at any plant during the preceding month at not less than the uniform price, subject to differentials set forth in sections 2 and 3 of this article."

Article VII, § 2. "Transportation and Location Differentials.— The uniform price shall be plus or minus the differential shown in column B of the schedule contained in section 3 of article IV for the zone of the plant as established for the purposes of section 3 of article IV, plus 25 cents in the case of plants located in the counties listed in paragraph 8 of section 1 of article VI."

Article VII, § 5. "Payments to Cooperative Associations.—Any cooperative association of producers may apply to the Secretary for a determination of its qualifications to receive payments pursuant to this section by reason of its having and exercising full authority in the sale of the milk of its members, using its best efforts to supply, in times of short supply, Class I milk to the marketing area and to secure utilization of milk, in times of long supply, in a manner to assure the greatest possible returns to all producers, and having its entire activities under the control of its members. . . . Such payments shall be made to each cooperative association of producers under the following conditions and at the following rates:

"1. One cent per hundredweight of net pooled milk at any handler's plant which was caused to be delivered from its members

milk and its products. An exception was made as to milk regulated by the order of the Commissioner of Agriculture and Markets of the State of New York. The Secretary further found that prices calculated in accordance with the Agricultural Marketing Agreement Act of 1937

by such association and on which such handler has made the reports and payments required by this order.

"2. Except as set forth in paragraph 3 of this section, 2½ cents per hundredweight of net pooled milk at plants of other handlers which was reported and collected for by such association.

"3. Five cents per hundredweight of net pooled milk at plants operated by such association and, if, in addition to the other qualifications, such association has been determined by the Secretary to have sufficient plant capacity to receive all the milk of producers who are members and to be willing and able to receive milk from producers not members, 5 cents per hundredweight of any net pooled milk which was caused by it to be delivered to any other handler and which is reported and collected for by such association.

"Sec. 6. Market Service Payment.—The market administrator shall pay out of the producer settlement fund to any handler immediately after audit of claim for such payment made on forms supplied by the market administrator:

"1. With respect to milk received from producers at a plant operated by such handler equipped only for the receiving and shipping of milk to the marketing area, which was, during any month except November or December, moved to a plant where it was utilized in Classes II–A, II–B, III–A, III–B, III–C, III–D, or, during the month of October, IV–A, and from which, if operated by such handler, no Class I milk was shipped to the marketing area during such month, 23 cents per hundredweight of milk so moved, plus 4 cents per hundredweight for the first five miles or fraction thereof, plus ¼ cent per hundredweight per mile for the next 20 miles, and plus $\frac{1}{10}$ of 1 cent per hundredweight per additional mile, of the shortest highway distance between the two plants; and

"2. Thirty cents per hundredweight of Class I milk sold during the months of November and December in the marketing area which was received from producers at a plant which is equipped for condensing or drying milk and from which, during the months of May and June preceding, in terms of equivalent of milk received at such plant, no milk in excess of 10 percent and no cream in excess of 50 percent was shipped to the marketing area."

to give this milk a purchasing power equivalent to the parties mentioned in §§ 2 and 8e of that Act were not reasonable in view of the supplies and prices of feeds and other economic conditions which affect the supply and demand for milk. He then fixed a minimum price for milk to be determined from time to time by formula.

By the Order the marketing area is defined as the City of New York and the counties of Nassau, Suffolk and Westchester. A producer is any person producing milk delivered to a handler at a plant approved by a health authority for the receiving of milk for sale in the marketing area. A handler is a person engaged in the handling of milk or cream received at an approved plant for similar sale. "Handler" includes coöperative associations. The administrative sections of the Order setting up a milk administrator and defining his duties are not attacked. Nor are those which classify milk.

Article IV is important since it establishes minimum prices for milk. There are various differentials based upon use, butter fat content, and distances between the points of production and consumption which it is unnecessary to analyze. For the purposes of this opinion it is sufficient to say, as an example, that the minimum price each handler should pay for milk is fixed by a formula which varies with the butter-price range for 92-score butter at wholesale in the New York market during the 60 days preceding the 25th day of the preceding month. The handlers are required to file reports as to their receipts and utilization of milk of the various classes. It should be understood, however, that this minimum price is not the amount which the producer receives but the price level or so-called "value" from which is calculated the actual amount in dollars and cents which he is to receive.

By Article VI a uniform price is computed and it is this uniform price which the producer is actually paid by

the proprietary (noncoöperative) handlers. The uniform price is determined by a computation which in substance multiplies the amount of milk (classified according to its use) received by all handlers, less certain quantities of milk permitted to be deducted, by the minimum prices fixed by Article IV for the different classes of milk. From the result various payments and reservations are deducted and the remainder is divided by the total quantity of milk received. To equalize, handlers pay into the producer settlement fund. While much over-simplified the operation will be made clear by summarizing the provisions of Article VII to require that handlers shall pay to the producer settlement fund the amount by which their purchased milk multiplied by the minimum prices for the various classes is greater than their purchased milk multiplied by the uniform price. When the handlers' purchased milk multiplied by the minimum price is less than when it is multiplied by the uniform price, the producer settlement fund pays them the difference for distribution to their producers. These provisions give uniform prices to all producers, with exceptions to be herein stated, in accordance with the general use of milk for the preceding period.

Other provisions of the Order upon which an attack is made will be pointed out in the discussion of the particular objections.

*Suspension of Order.*—It developed at the argument of the causes in this Court that the Secretary of Agriculture on March 18, 1939,[15] had suspended Order No. 27 on account of the effect of the decree below on its administration and enforcement. § 8c (16)- (A). Since this suspension is authorized by the statute and the Order preserves accrued rights, we are of the opinion this step does not make these proceedings moot. Reports

---

[15] 4 Fed. Reg. 1259.

of their receipts and classified sales of milk, accounting of their pool obligations in the determination of the uniform price and settlement with their producers on the basis of the Order, as well as the payment of money, are sought from the defendants. The controversy over the validity of the Order and the power to enforce its provisions remains.

*Adoption of the Order.*—Before considering the validity of the Marketing Act and the provisions of the Order under attack, we shall examine the contention of the defendants that the Order was adopted under circumstances which require a court of equity to refuse to enforce it. After dealers had refused or failed to sign the proposed marketing agreement, the Secretary conducted a referendum under § 8c (19) to ascertain whether the issuance of Order No. 27 was approved by two-thirds of the producers, as required by § 8c (9). Vigorous campaigns were waged by both proponents and opponents of the Order. Among the proponents were the League and the Agency. After the vote, the Secretary on August 24, 1938, with the approval of the President, determined that the issuance of the Order was favored by at least two-thirds of the producers, and declared it effective as of September 1, 1938.[16]

The defendants base their appeal to the conscience of the chancellor upon matters connected with the referendum which they claim amount to fraud in its adoption. The alleged fraud is said to consist of widespread public misrepresentations to the effect that all producers would receive the same price for their milk and a conspiracy between the League and others to convert the state and national acts into instruments for the creation of a monopoly in large handlers in the sale of fluid milk in the marketing area.

[16] 3 Fed. Reg. 2100.

The findings supporting the charges of misrepresentation and conspiracy may be summarized as determining that the intervening plaintiffs, the League and the Agency, participated actively in proposing, adopting and inducing both producers and handlers to accept the Order. In greater detail, the findings show that the League was instrumental in the organization of the Agency; that it has representatives upon the Agency's Board of Directors; that the Agency has acted as an organization for promoting action under both federal and state acts; that both League and Agency published papers which gave vigorous support to the campaign for approval of the Order. At the time of the hearings the Agency issued an explanatory booklet stating that an equal purchasing price would be paid by all dealers for milk of the same use and that each producer would share equally the benefits of the fluid milk market. Both Agency and League announced repeatedly that handlers would be required to pay a uniform price and that no handler would receive a competitive advantage over the others. The Agency expended over $63,000 between December 1, 1937, and June 1, 1938, and over $45,000 between the latter date and September 1, 1938, the date the order went into effect, as it actively supported the federal-state order program. Voting on the Order took place August 18, 19 and 20. Of 38,627 votes counted as valid in the referendum, 33,663 or 87.1 percent were in favor of the issuance of the Order, and 4,964 or 12.9 percent were opposed. Of the favorable votes, the League cast 22,287.

Supporting evidence beyond the coördinated activities of the Agency, the League and other coöperatives for the charge of conspiracy to monopolize by securing the adoption of the Order was found by the District Court in the provisions of the Order. Competitive advantages to coöperatives in the Order were thought by it to indicate an improper influence by them in its drafting. These will

be discussed later from the point of view of their legality under permissible classification. The court found that the conspiracy to obtain a monopoly was carried out by coercive tactics on the part of producers, under the leadership of the League and the Agency. These tactics consisted of threats to handlers that if they did not comply with the Order, the producers would withhold delivery of milk. These schemes, the lower court determined, were so successful in securing the drafting, adoption and acceptance of the Order that a conspiracy to monopolize interstate commerce contrary to the Sherman Act was established. It held that the occurrence of the incidents just detailed compelled refusal of the injunction. We do not agree.

While considering the manner of the adoption of the Order, the validity of the Act and the provisions of the Order must be assumed. The Order was submitted to the producers for approval after the hearings specified in the statute. The full text of the Order with explanatory pamphlets was mailed each prospective voter. In the face of this fact, erroneous statements cannot be permitted to render the submission futile. There is no evidence that any producer misunderstood. A casual sentence in one of the pamphlets of the Department of Agriculture and a number of other statements in publications of the League and Agency were to the effect that dealers would pay all producers the uniform price for milk. Such assertions need the qualifications given in the Order that they are not applicable to milk sold outside the marketing area or to milk handled by coöperatives. The variation from the facts is not immaterial in view of the value or volume of milk involved. But the Order, Article VII, plainly stated that coöperatives were not covered by the payment requirements and it appeared, also, that milk sold outside the marketing area was not

within its terms. A study of the official form of the Order would have cleared up any misconception created by the language. The Secretary of Agriculture declared that three-fourths of the producers affected by the Order approved its terms. The litigants do not deny that three-fourths of the voters voted for the institution of the Order. There is no authority in the courts to go behind this conclusion of the Secretary to inquire into the influences which caused the producers to favor the resolution.

The coercion by the League and the Agency, exercised upon the handlers after the adoption of the Order to force or induce them to acquiesce in its operation, is of the same indirect character as the alleged misrepresentation. It is the partisan coercion of the producer seeking to compel dealer support of the plan by the threat of the use of his economic power over his own milk. The coercion was ineffective upon these defendants. Producers' organizations urged in their papers and meetings diversion of milk from handlers to influence them to agree to the Order. Such efforts could not have had an effect on the prior vote of the producers. It is quite true that the League which itself cast two-thirds of the favorable votes was in a position to cast more than one-third of the total qualified vote against the Order. This arises from the provision of the Act, authorizing coöperatives to express the approval or disapproval for all of their members or patrons.[17] This is not an unreasonable provision, as the coöperative is the marketing agency of those for whom it votes. If the power is in the Congress to put the order in effect, the manner of the demonstration of further approval is likewise under its control. These associations of producers of milk have a vital interest in the establishment of an efficient marketing system. This ade-

---

[17] § 8c (12).

quately explains their interest in securing the adoption of an order believed by them to be favorable for this purpose. If ulterior motives of corporate aggrandizement stimulated their activities, their efforts were not thereby rendered unlawful.[18] If the Act and Order are otherwise valid, the fact that their effect would be to give cooperatives a monopoly of the market would not violate the Sherman Act or justify the refusal of the injunction.

*Correlation of Order and Act.* There is another phase of the argument against the Order which is not affected by the validity of the Act or its application in the Order and therefore is ready for disposition before the constitutional questions need be reached. Defendants contend there is no statutory basis for the sections of the Order exempting cooperatives from the payment of the uniform price[19] and authorizing payments to them and certain handlers from the producer settlement fund.[20]

The Government makes the point that none of the defendants, all handlers, can object to these terms of the Order because only producers delivering milk to cooperatives are affected by the exemption of cooperative handlers from the requirement to pay at not less than the uniform price and only producers are affected by the use of the pooled money for §§ 5 and 6 payments to cooperative and other handlers. Although three of the defendants cannot complain of the benefits conferred upon cooperatives, for they are cooperatives, the defendant Jetter Dairy Company has standing to raise the issue of want of statutory authority to except cooperative handlers from the payment of the uniform price. It is a proprietary corporation, a handler of milk, required by the Order

---

[18] Cf. *Isbrandtsen-Moller Co.* v. *United States,* 300 U. S. 139, 145; *California Water Service Co.* v. *Redding,* 304 U. S. 252, 254.

[19] Article VII, § 1.

[20] Article VII, §§ 5 and 6.

to pay uniform prices for the milk it purchases.[21] This requirement to pay uniform prices arises from the provisions of Article IV that it shall pay minimum prices. The two are the same except for the deduction of certain service payments. The coöperatives are excepted from the payment. The burden of payment is laid directly upon Jetter while others are excepted. None of the defendants, on the other hand, is in a position to raise the issue of lack of statutory authority for the payments authorized by Article VII, §§ 5 and 6. Whether coöperative or not, the defendant corporations have no financial interest in the producer settlement fund. All defendants pay into, or draw out of, that fund in accordance with their utilization of the milk delivered to them by their patrons. The defendants' profit or loss depends upon the spread each receives between the class price and sale price. If the deductions from the fund are small or nothing, the patron receives a higher uniform price but the handler is not affected.[22]

We now consider whether the Act authorizes the exception of the coöperatives from the uniform payment provisions of Article VII, § 1. This authority, if it exists, is in § 8c (5) (F) of the Act. The earlier paragraphs provide for minimum prices to be paid by handlers to producers and associations of producers, subject to usual quality and location differentials not important here. These would require minimum prices to be paid by coöperatives when, as here, they were handlers under the definition of the Order,[23] were it not for the exception of

[21] Article VII, § 1.

[22] *Currin* v. *Wallace,* 306 U. S. 1, 18; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 42; *Oliver Iron Mining Co.* v. *Lord,* 262 U. S. 172, 181; *Gorieb* v. *Fox,* 274 U. S. 603, 606; cf. *Carmichael* v. *Southern Coal Co.,* 301 U. S. 495, 513; *Steward Machine Co.* v. *Davis,* 301 U. S. 548, 598.

[23] Article I, § 1, subsec. 6.

these same coöperatives under subsection (F): "Nothing . . . shall . . . prevent a coöperative . . . from . . . making distribution thereof [net proceeds] . . . in accordance with the contract between the association and its producers." This language specifically permits, indeed requires, the Order to except coöperatives from the requirement of paying minimum prices to producers. As the minimum price is paid to the producer through the payment of the uniform price, after equalization in the pool, there is authority in the Act to except the coöperative from the payment of the uniform price.

## I. Terms of the Order.

Certain provisions of the Order were found by the District Court to show unconstitutional discrimination against one or more of the defendants. The discriminations of which complaint is made arise from the application to the New York problem of § 8c (5) of the Act relating to milk.

A. *Uniform Price.*—The Jetter Dairy Company, a proprietary handler, urges that as milk coöperatives need not pay producers a uniform price, it is unreasonably discriminatory and violative of the due process clause of the Fifth Amendment to require it to pay this uniform price. In § 8c (5) (F) there is a definition of the type of coöperative permitted to settle with its members in accordance with the membership contract. The general characteristics of coöperatives are well understood. The Capper-Volstead Act defines such coöperatives as associations of producers, corporate or otherwise, with or without capital stock, marketing their product for the mutual benefit of the members as producers with equal voting privileges, restricted dividends on capital employed and dealings limited to 50 percent non-member products.[24] Different

---

[24] 42 Stat. 388.

treatment has been accorded marketing coöperatives by state and federal legislation alike.[25] Indeed the Secretary is charged by this Act to "accord such recognition and encouragement to producer-owned and producer-controlled coöperative associations as will be in harmony with the policy toward coöperative associations set forth in existing Acts of Congress, and as will tend to promote efficient methods of marketing and distribution."[26] These agricultural coöperatives are the means by which farmers and stockmen enter into the processing and distribution of their crops and livestock. The distinctions between such coöperatives and business organizations have repeatedly been held to justify different treatment.[27] *Frost*

[25] United States—The Clayton Act, § 6, 38 Stat. 731; Robinson-Patman Act, § 4, 49 Stat. 1528; Capper-Volstead Act, 42 Stat. 388; War Finance Corporation Act, 40 Stat. 506, as amended 42 Stat. 181, 182; The Grain Futures Act, 42 Stat. 1000; The Agricultural Marketing Act, 46 Stat. 91.
States—See Hanna, The Law of Coöperative Marketing Associations (1931), c. 3.

[26] Agricultural Adjustment Act, § 10 (b), 48 Stat. 37, as amended by § 16 (b) (1) of the Act of August 24, 1935, 49 Stat. 767, as adopted by § 1 (h) of the Act of June 3, 1937, 50 Stat. 246.

[27] *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 173; *Brushaber* v. *Union Pacific Railroad Co.*, 240 U. S. 1, 21; *Chicago Board of Trade* v. *Olsen*, 262 U. S. 1, 40; *Liberty Warehouse Co.* v. *Burley Tobacco Growers Cooperative Assn.*, 276 U. S. 71, 89. The Government furnishes us with a collection of state cases approving the special advantages given co-operatives: *Tobacco Growers Coop. Assn.* v. *Jones*, 185 N. C. 265; 117 S. E. 174; *Kansas Wheat Growers* v. *Schulte*, 113 Kan. 672; 216 P. 311; *Brown* v. *Staple Cotton Growers Co-op. Assn.*, 132 Miss. 859; 96 So. 849; *Northern Wisconsin Co-op. T. P.* v. *Bekkedal*, 182 Wis. 571; 197 N. W. 936; *Dark Tobacco Gr. Co-op. Assn.* v. *Dunn*, 150 Tenn. 614; 266 S. W. 308; *Minnesota Wheat Growers* v. *Huggins*, 162 Minn. 471; 203 N. W. 420; *List* v. *Burley Tobacco Growers Co-op. Assn.*, 114 Ohio St. 361; 151 N. E. 471; *Dark Tobacco Growers Co-op. Assn.* v. *Robertson*, 84 Ind. App. 51; 150 N. E. 106; *Potter* v. *Dark Tobacco Growers Co-op.*, 201 Ky. 441; 257 S. W. 33; *Harrell* v. *Cane Growers Co-op.*, 160 Ga. 30; 126

v. *Corporation Commission*[28] in fact recognized the validity of such classification. The Commission was enjoined from issuing a license for the operation of a coöperative cotton gin, under a proviso directing it to do so on petition of 100 citizens and taxpayers without the showing of public necessity required for other ginners. The applicant was organized for profit, though dividends were limited, and its membership was not confined to producers. The court thought the distinctions had no reasonable relation to the subject of the legislation, special opportunities for coöperatives. It was said the Court had "no reason to doubt" that the classification was valid as applied to true coöperatives.[29]

The producer coöperative seeks to return to its members the largest possible portion of the dollar necessarily spent by the consumer for the product with deductions only for modest distribution costs, without profit to the membership coöperative and with limited profit to the stock coöperative. It is organized by producers for their mutual benefit.[30] For that reason, it may be assumed that it will seek to distribute the largest amounts to its patrons.

---

S. E. 531; *Nebraska Wheat Growers* v. *Norquest*, 113 Neb. 731; 204 N. W. 798; *Warren* v. *Alabama Farm B. Cotton Assn.*, 213 Ala. 61; 104 So. 264; *Manchester Dairy System* v. *Hayward*, 82 N. H. 193; 132 Atl. 12, 19; *Clear Lake Co-operative Live Stock Assn.* v. *Weir*, 200 Iowa 1293; 206 N. W. 297; *Hollingsworth* v. *Texas Hay Assn.*, 246 S. W. 1068; *Washington Cranberry Assn.* v. *Moore*, 117 Wash. 430; 201 P. 773; *Poultry Producers* v. *Barlow*, 189 Cal. 278; 208 P. 93; *Oregon Growers Co-op. Assn.* v. *Lentz*, 107 Ore. 561; 212 P. 811; *South Carolina Cotton Growers* v. *English*, 135 S. C. 19; 133 S. E. 542; *Milk Producers Co.* v. *Bell*, 234 Ill. App. 222 and *Barns* v. *Dairymen's Co-operative Assn., Inc.*, 220 App. Div. (N. Y.) 624; 222 N. Y. S. 294.

[28] 278 U. S. 515.

[29] *Id.*, 523.

[30] Cf. N. Y. Coöperative Corporations Law.

The commodity handled by a coöperative corresponds for some purposes to the capital of a business corporation. Either may cut sale prices below cost, one as long as its members will deliver, the other as long as its assets permit. When proprietary corporations lower sales prices, they naturally seek to lower purchase prices. Their profit depends on spread. On the other hand, the coöperative cannot pass the reduction. All the selling price less expense is available for distribution to its patrons. As its own members bear the burden of price cutting, it was reasonable to exempt it from the payment of the fixed price. The coöperative member measures his return by the market or uniform price the business handler pays. In commodities with the wide market of staple dairy products, quotations are readily available. If distributions do not equal open prices, the coöperators' reactions would parallel those of stockholders of losing businesses. Neither the Act nor the order protects anyone from lawful competition, nor is it essential that they should do so.[31] We do not find an unreasonable discrimination in excepting producers' coöperatives from the requirement to pay a uniform price.

B. *Unpriced Milk*. Another discrimination is said to reside in that part of the Order which limits minimum prices to milk "sold in the marketing area or which passes through a plant in the marketing area." Other milk, though from the same production area, is "unpriced milk" and does not figure in the computation of the uniform price. Where both priced and unpriced milk are dealt in by a handler, he must furnish a statement to the producer showing the percentage of his milk paid for at the uniform price.[32] The defendants handle only milk which is sold in the marketing area. They assert that an un-

---

[31] *Railroad Co.* v. *Ellerman*, 105 U. S. 166; *Alabama Power Co.* v. *Ickes*, 302 U. S. 464, 480.

[32] Order, Article VII, § 1.

reasonable discrimination results in favor of handlers, such as the League, which market milk both in and outside the marketing area.

The basis of the complaint is that large dealers and coöperative handlers with extensive gathering and distributing facilities are permitted to purchase milk throughout the milk shed at any price they please, if the milk does not pass through a plant in the marketing area, and sell it at any price they please, provided the sale is outside the limited New York marketing area. By reason of the fact that milk sells for more in New Jersey than in New York, a greater profit is made by the handler. If he so desires, the handler can use this profit to replace losses on New York area sales and still be in a position to pay the uniform price to producers on pool milk. This is said to create a discrimination against the defendants.

It is possible for the handlers with unpriced milk to use their profits from the profitable extra area trade in the way suggested. It was equally possible for them to do so before the Order. It is a competitive situation which the Order did not create and with which it does not deal. We are of the view that there is no discrimination by reason of this situation.

The District Court found that handlers of unpriced milk "are permitted to blend prices paid or purported to have been paid for such milk sold in other markets, with the uniform price announced by the Administrator for milk sold in the area, thereby reducing the actual price paid by such handlers, for milk sold in the Metropolitan Area, in competition with milk sold by the defendants." "If the price figured by the handler for unpriced milk, is lower than its actual market value, the handler, by blending, is thereby permitted to pay producers for all milk at less than the Order price, and less than the actual value thereof." It is erroneous to suppose that by buying some milk at less than the minimum, the

"actual price" paid for milk sold in the marketing area is reduced. The price paid for all milk sold by proprietary handlers in that area is the uniform price. Unpriced milk from the same producer may be bought for less. The average paid the producer may be below the minimum but for the part sold in the marketing area or passing through plants there located the minimum is paid. This is all that justifies the language of the finding that "the handler, by blending, is thereby permitted to pay producers for all milk at less than the Order price. . . ."

C. *Nearby Differentials.* Provision is made by the Order for special differentials of 20 cents on milk from certain counties located most favorably to the marketing area.[33] This is to enable handlers to pay the producers at these plants.[34] The five cent difference is absorbed by the handlers. The Act authorizes such an arrangement. § 8c (5) (A). This was found discriminatory as between producers by the District Court but there was no finding or conclusion of law as to any discrimination against defendants. The District Court was of the opinion this was unfair to these defendants who have no patrons in these counties. Here the defendants urge further advantages from this arrangement to their competitors who have patrons in these counties because near locations, freight differentials considered, have lower transportation costs. The differential increases milk prices to the producers. This payment tends to stimulate production. Larger production means more benefit from the freight advantage to competitors. The discrimination seems fanciful and remote. It would not justify a court in overturning the Secretary's determination of the propriety of the differentials on evidence found by the lower court to be substantial. Such an administrative determination carries a presumption of the existence of a state

[33] Order, Article VI, § 1.
[34] Order, Article VII, § 2.

of facts justifying the action far too strong to be over-turned by such suggestions as are made here.[35]

## II. Constitutionality of the Act.

A. *Minimum Prices.* The Act authorizes and the Order undertakes the fixing of minimum prices for the purchase of milk "in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce" in milk.[36] There is no challenge to the fact that the milk of all four defendants reaches the marketing area through the channels of inter-state commerce. Nor is any question raised as to the power of the Congress to regulate the distribution in the area of the wholly intrastate milk. It is recognized that the federal authority covers the sales of this milk, as its marketing is inextricably intermingled with and directly affects the marketing in the area of the milk which moves across state lines.[37]

The challenge is to the regulation "of the price to be paid upon the sale by a dairy farmer who delivers his milk to some country plant." It is urged that the sale, a local transaction, is fully completed before any inter-state commerce begins and that the attempt to fix the price or other elements of that incident violates the Tenth Amendment. But where commodities are bought for use beyond state lines, the sale is a part of interstate com-

[35] *Borden's Farm Products Co.* v. *Baldwin,* 293 U. S. 194, 209; *Pacific States Co.* v. *White,* 296 U. S. 176, 185.

[36] § 8c (1).

[37] *Stafford* v. *Wallace,* 258 U. S. 495; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1; *Houston & Texas Ry. Co.* v. *United States,* 234 U. S. 342, 351–2; *Minnesota Rate Cases,* 230 U. S. 352, 399; *Labor Board Cases,* 301 U. S. 1; *Currin* v. *Wallace,* 306 U. S. 1; *Mulford* v. *Smith, ante,* p. 38; *National Labor Relations Board* v. *Fainblatt,* 306 U. S. 601.

merce.[38] We have likewise held that where sales for interstate transportation were commingled with intrastate transactions, the existence of the local activity did not interfere with the federal power to regulate inspection of the whole.[39] Activities conducted within state lines do not by this fact alone escape the sweep of the Commerce Clause. Interstate commerce may be dependent upon them.[40] Power to establish quotas for interstate marketing gives power to name quotas for that which is to be left within the state of production.[41] Where local and foreign milk alike are drawn into a general plan for protecting the interstate commerce in the commodity from the interferences, burdens and obstructions, arising from excessive surplus and the social and sanitary evils of low values, the power of the Congress extends also to the local sales.

This power over commerce when it exists is complete and perfect.[42] It has been exercised to fix a wage scale for a limited period,[43] railroad tariffs[44] and fees and charges for live-stock exchanges.[45]

The authority of the Federal Government over interstate commerce does not differ in extent or character from that retained by the states over intrastate com-

[38] *Dahnke-Walker Milling Co.* v. *Bondurant*, 257 U. S. 282, 290, 291; *Lemke* v. *Farmers' Grain Co.*, 258 U. S. 50, 54; cf. *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1, 10.

[39] *Currin* v. *Wallace*, 306 U. S. 1.

[40] *Consolidated Edison Co.* v. *National Labor Relations Board*, 305 U. S. 197, 220.

[41] *Mulford* v. *Smith, supra,* note 37.

[42] *Gibbons* v. *Ogden*, 9 Wheat. 1, 196; *Minnesota Rate Cases*, 230 U. S. 352, 398.

[43] *Wilson* v. *New*, 243 U. S. 332, 346.

[44] 34 Stat. 589, 49 U. S. C. §.15 (1).

[45] *Tagg Bros. & Moorhead* v. *United States*, 280 U. S. 420; *Stafford* v. *Wallace*, 258 U. S. 495.

merce. Since *Munn* v. *Illinois*, this Court has had occasion repeatedly to give consideration to the action of states in regulating prices.[46] Recently, upon a reëxamination of the grounds of state power over prices, that power was phrased by this Court to mean that "upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells." [47]

The power of a state to fix the price of milk has been adjudicated by this Court.[48] The people of great cities depend largely upon an adequate supply of pure fresh milk. So essential is it for health that the consumer has been willing to forego unrestricted competition from low cost territory to be assured of the producer's compliance with sanitary requirements, as enforced by the municipal health authorities. It belongs to that category of commodities that for many years has been subjected to the regulatory power of the state. A thorough exposition of the milk situation in the New York shed was made in the *Nebbia* case. There is nothing to add to what was there said, save to point out that since that decision, we have held that a state cannot prohibit the sale of imported milk where the extra-state purchase price was below the prescribed minimum [49] and that a Pennsylvania regulatory

---

[46] *Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *Brass* v. *North Dakota*, 153 U. S. 391; *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389; *O'Gorman & Young* v. *Hartford Insurance Co.*, 282 U. S. 251; *Nebbia* v. *New York*, 291 U. S. 502; *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379; *Townsend* v. *Yeomans*, 301 U. S. 441.

*Wolff Packing Co.* v. *Industrial Court*, 262 U. S. 522; *Tyson & Bro.* v. *Banton*, 273 U. S. 418; *Fairmont Creamery Co.* v. *Minnesota*, 274 U. S. 1; *Ribnik* v. *McBride*, 277 U. S. 350; *Williams* v. *Standard Oil Co.*, 278 U. S. 235.

[47] *Nebbia* v. *New York*, 291 U. S. 502, 537.

[48] *Id.*

[49] *Baldwin* v. *Seelig*, 294 U. S. 511.

law, including minimum prices, applied in the absence of federal legislation to milk purchased in Pennsylvania for shipment into the New York marketing area.[50]  In *Hegeman Farms Corp.* v. *Baldwin,*[51] this Court sustained again the New York Milk Control Statute against the complaint that the price limits were arbitrary.  A variation in prices to be charged the consumer between dealers who had and dealers who had not well advertised trade names was upheld.[52]  The power enjoyed by the states to regulate the prices for handling and selling commodities within their internal commerce [53] rests with the Congress in the commerce between the states.

B. *Equalization Pool.*—In order to equalize the prices received by producers, handlers are required to clear their purchases through the producer settlement fund.  Payments into and withdrawals from this fund depend upon the "value" of the milk received which is fixed by the Order at different prices governed by the use made by the handler of the purchased milk and upon whether his obligations to producers are greater or less than the uniform price due the producers under the scheme.  The result of the use of the device of an equalization pool is that each producer, dealing with a proprietary handler, gets a uniform or weighted average price for his milk, with differentials for quality, location or other usual market variations, irrespective of the manner of its use.  The Act, § 8c (5) (B) (ii) and (C) and the Order, Articles IV, VI and VII, authorize such an adjustment.

The defendants' objection to the equalization pool, here considered, is not to the disbursements from the fund for expenses of standby or marketing services

---

[50] *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346.

[51] 293 U. S. 163.

[52] *Borden's Co.* v. *Ten Eyck,* 297 U. S. 251.

[53] *Nebbia* v. *New York,* 291 U. S. 502; *Townsend* v. *Yeomans,* 301 U. S. 441.

authorized by Article VII, §§ 5 and 6, concerning which we hold the handler has no standing to complain. It is to the alleged deprivation of liberty and property accomplished by the pooling requirement in taking away from the defendants their right to acquire milk from their patrons at the minimum class price, according to its use, and forcing the handlers to pay their surplus, over the uniform price, to the equalization pool instead of to their patrons. This argument assumes the validity of price regulation, as such, but denies the constitutionality of the pooling arrangement because handlers are not at liberty to pay the producer in accordance with the use of the producer's milk but must distribute the surplus to others whose milk was resold less advantageously. It is urged that to carry this principle of contribution to its logical conclusion would mean that the wages of the employed should be shared with the unemployed; the highly paid, with the underpaid; and the receipts of the able, the fortunate and the diligent, with the incompetent, the unlucky and the drone.

No such exaggerated equalization of wealth and opportunity is proposed. The pool is only a device reasonably adapted to allow regulation of the interstate market upon terms which minimize the results of the restrictions. It is ancillary to the price regulation designed, as is the price provision, to foster, protect and encourage interstate commerce by smoothing out the difficulties of the surplus and cut-throat competition which burdened this marketing. In *Mulford* v. *Smith*,[54] we made it clear that volume of commodity movement might be controlled or discouraged. As the Congress would have, clearly, the right to permit only limited amounts of milk to move in interstate commerce, we are of the opinion it might permit the movement on terms of pool settlement here provided.

---

[54] *Supra,* note 37.

Common funds for equalizing risks are not unknown and have not been considered violative of due process. The pooling principle was upheld in workmen's compensation,[55] bank deposit insurance,[56] and distribution of benefits in the Transportation Act.[57]

The defendants rely particularly upon *Thompson* v. *Consolidated Gas Utilities Corp.,*[58] and *Railroad Retirement Board* v. *Alton R. Co.*[59] In the *Thompson* case, the Texas Railroad Commission ordered proration of gas production in the Panhandle. It was assumed that proration to prevent waste and protect correlative rights in a pool was valid but it was held that the proration order in issue was for none of these purposes. It was for the "sole purpose . . . to compel those [with market outlets] . . . to purchase gas from potential producers" who have no market. This was not deemed to be reasonably related to the conservation of gas or the protection of correlative rights. In the *Retirement Board* case, the pooling principle was involved but was found to be invalid because the burdens on the roads were not equalized with the benefits. Entry on service was made at different age levels for different roads. Employees seventy or older were required to retire. Some roads had none. Solvent and insolvent roads were liable alike. All carriers were treated as a single employer. It was these provisions, deemed unequal, which led to the conclusion that the manner of pooling of funds denied due process. In this case, the pooling has differentials to cover the variations of quality and location.

---

[55] *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *New York Central R. Co.* v. *White,* 243 U. S. 188.

[56] *Noble State Bank* v. *Haskell,* 219 U. S. 104; *Abie State Bank* v. *Bryan,* 282 U. S. 765.

[57] *New England Divisions Case,* 261 U. S. 184; *Dayton Goose Creek Ry.* v. *United States,* 263 U. S. 456.

[58] 300 U. S. 55, 77, 78.

[59] 295 U. S. 330, 355 *et seq.*

C. *Delegation.*—There are three issues of delegation presented: (1) the delegation of authority to the Secretary of Agriculture to establish marketing areas; (2) the delegation of authority to producers to approve a marketing order without an agreement of handlers; and (3) the delegation of authority to coöperatives to cast the votes of producer patrons.

From the earliest days the Congress has been compelled to leave to the administrative officers of the government authority to determine facts which were to put legislation into effect and the details of regulations which would implement the more general enactments. It is well settled, therefore, that it is no argument against the constitutionality of an act to say that it delegates broad powers to executives to determine the details of any legislative scheme. This necessary authority has never been denied.[60] In dealing with legislation involving questions of economic adjustment, each enactment must be considered to determine whether it states the purpose which the Congress seeks to accomplish and the standards by which that purpose is to be worked out with sufficient exactness to enable those affected to understand these limits. Within these tests the Congress needs specify only so far as is reasonably practicable.[61] The present Act, we believe, satisfies these tests.

1. *Delegation to the Secretary of Agriculture.*—The purpose of the Act is "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to

[60] *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 421; *Schechter Corp.* v. *United States,* 295 U. S. 495, 529; *Currin* v. *Wallace,* 306 U. S. 1.

[61] *Buttfield* v. *Stranahan,* 192 U. S. 470, 496; *United States* v. *Chemical Foundation,* 272 U. S. 1, 12; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177, 193; *United States* v. *Grimaud,* 220 U. S. 506, 516; *Avent* v. *United States,* 266 U. S. 127, 130.

farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period." To accomplish this, the Secretary of Agriculture is directed to issue orders, whenever he has reason to believe the issuance of an order will tend to effectuate the declared policy of the act. Unlike the language of the National Industrial Recovery Act condemned in the *Schechter* case, page 538, the tests here to determine the purpose and the powers dependent upon that conclusion are defined. In the Recovery Act the Declaration of Policy was couched in most general terms.[62] In this Act it is to restore parity prices, § 2. Under the Recovery Act, general welfare might be sought through codes of any industry, formulated to express standards of fair competition for the businesses covered. Here the terms of orders are limited to the specific provisions, minutely set out in § 8c (5) and (7). While considerable flexibility is provided by § 8c (7) (D),

---

[62] "Section 1. A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." 48 Stat. 195.

it gives opportunity only to include provisions auxiliary to those definitely specified.

The Secretary is not permitted freedom of choice as to the commodities which he may attempt to aid by an order. The Act, § 8c (2), limits him to milk, fresh fruits except apples, tobacco, fresh vegetables, soybeans and naval stores. The Act authorizes a marketing agreement and order to be issued for such production or marketing regions or areas as are practicable. A city milkshed seems homogeneous. This standard of practicality is a limit on the power to issue orders. It determines when an order may be promulgated.

It is further to be observed that the Order could not be and was not issued until after the hearing and findings as required by § 8c (4). Public hearings were held at Albany, Malone, Syracuse, Elmira, and New York from May 16 to June 7, 1938, with four days' recess. Nearly three thousand pages of testimony were introduced, eighty-eight documentary exhibits and some twenty briefs by interested parties were filed. On July 23, 1938, the Secretary, in the Federal Register, notified the public of his findings and the terms of the Order and again invited comment. Numerous parties again filed briefs. A right by statute is given handlers to object to the Secretary to any provision of an order as not "in acordance with law," with the privilege of appeal to the courts. § 8c (15) (A) and (B). Even though procedural safeguards cannot validate an unconstitutional delegation, they do furnish protection against an arbitrary use of properly delegated authority.[63]

A further provision of the Act is to be noted as it was employed as a standard to determine the minimum price. This is § 8c (18). Acting under this section, the Secretary fixed a fluctuating minimum price based upon wholesale butter prices in New York. While it is true that the

---

[63] Cf. *Schechter Corp.* v. *United States*, 295 U. S. at 533.

determination of price under this section has a less definite standard than the parity tests of §§ 2 and 8e, we cannot say that it is beyond the power of the Congress to leave this determination to a designated administrator, with the standards named. The Secretary must have first determined the prices in accordance with § 2 and § 8e, that is, the prices that will give the commodity a purchasing power equivalent to that of the base period, considering the price and supply of feed and other pertinent economic conditions affecting the milk market in the area. If he finds the price so determined unreasonable, it is to be fixed at a level which will reflect such factors, provide adequate quantities of wholesome milk and be in the public interest. This price cannot be determined by mathematical formula but the standards give ample indications of the various factors to be considered by the Secretary.

2. *Delegation to Producers.*—Under § 8c (9) (B) of the Act it is provided that any order shall become effective notwithstanding the failure of 50 percent of the handlers to approve a similar agreement, if the Secretary of Agriculture with the approval of the President determines, among other things, that the issuance of the order is approved by two-thirds of the producers interested or by interested producers of two-thirds of the volume produced for the market of the specified production area. By subsection 19 it is provided that for the purpose of ascertaining whether the issuance of such order is approved "the Secretary may conduct a referendum among producers." The objection is made that this is an unlawful delegation to producers of the legislative power to put an order into effect in a market. In considering this question, we must assume that the Congress had the power to put this Order into effect without the approval of anyone. Whether producer approval by election is

necessary or not, a question we reserve, a requirement of such approval would not be an invalid delegation.[64]

3. *Authorization of Coöperatives to Cast the Votes of Producer Patrons.*—This objection, too, falls before the answering argument that inasmuch as Congress could place the Order in effect without any vote, it is permissible for it to provide for approval or disapproval in such way or manner as it may choose.

*Coöperatives in the Equalization Fund.*—The defendant, Central New York Coöperative Association, denies liability under Articles VI, VII and VIII of the Order on the ground that it is not liable to pay its net pool obligation into the administrative fund or to meet the expenses of administration. The asserted reason for its freedom from liability is that it is a coöperative composed of milk producers and distributes the milk of its members and others as agent.

The coöperative owns no farms. Its members are dairy farmers. By their contract they agree "to deliver . . . all . . . milk produced . . . which said milk is to be marketed and distributed by the [coöperative] . . ." The latter "agrees to pay . . . for the milk . . . a price . . . based upon the amount received . . . less the expenses . . ." Nonmembers' milk is marketed under the same contract. The coöperative leases receiving and distributing facilities from a business corporation. The milk is received by the coöperative at receiving plants and shipped to the city depot. It distributes through other business corporations which are wholly-owned subsidiaries of the coöperative. These distributing subsidiaries use the leased physical facilities under verbal contracts with the coöperative. The coöperative receives the net amount from the sales and distributes to its patrons under license from the Director of the Division of

[64] *Currin v. Wallace,* 306 U. S. 1, 15.

Milk Control of New York permitting the marketing in the manner described.

Section 8c (5) (A) authorizes an order to classify milk and fix minimum prices which all handlers shall pay for milk purchased from producers. Section 8c (5) (C) authorizes the equalization pool and the handlers' payment to this settlement fund. It is urged that coöperatives which merely act as agents for their members are not included in handlers purchasing from producers. This is said to be definitely shown by the provisions of § 8c (5) (F) providing that nothing contained in the subsection shall be construed to prevent a Capper-Volstead coöperative from making distribution to its "producers in accordance with the contract." The Order defines a handler as including a coöperative association "with respect to any milk received from producers at any plant operated by such association or with respect to any milk which it causes to be delivered" to other handlers. Under the provisions of the Order, Article VII, §§ 8 and 9, coöperative handlers as other handlers equalize their purchases by payment into the producer settlement fund, even though they are not required to pay the uniform price to their producers by reason of the exception of Article VII, § 1, and the provisions of § 8c (5) (F), as explained at page 561.

Coöperative contracts are of two general types, sale and agency.[65] The Central New York Coöperative operates under the agency type.

It is obvious that the use of the word "purchased" in the Act, § 8c (5) (A) and (C), would not exclude the "sale" type of coöperative. When § 8c (5) (F) was drawn, however, it was made to apply to both the "sale" and "agency" type without distinction. This would indicate there had been no intention to distinguish between the two types by (A) and (C). The section which au-

---

[65] Hanna, Law of Coöperative Marketing Associations, pp. 210, 256.

thorizes all orders, § 8c (1), makes no distinction. The orders are to be applicable to "processors, associations of producers, and others engaged in the handling" of commodities. The reports on the bill show no effort to differentiate.[66] Neither do the debates in Congress. The statutory provisions for equalization of the burdens of surplus would be rendered nugatory by the exception of "agency" coöperatives. The administrative construction has been to include such organizations as handlers.[67] With this we agree. As here used the word "purchased" means "acquired for marketing." Subsection (A) cannot be construed as freeing agents, coöperative or proprietary, from the requirement to account at the minimum prices for milk handled.

As a corollary the contention is made also by Central Coöperative that no coöperative may be required to pay its surplus receipts over uniform prices into the equalization fund. This, too, is based upon a construction of § 8c (5)(F) as permitting a coöperative to make settlement with its members in accordance with the terms of its own contract with them. If the coöperative members were freed of the burden of carrying their proportion of milk going to manufacturing use, the discrimination in their favor would be most strongly marked. Such a construction is not required. Coöperatives are covered by § 8c (1) and (5) (A) and (B), and by the provisions of the Order, except as to the payment of the uniform price. Any payments below the uniform price fall on their members. We are of the view that the administrative construction is correct and that the "net proceeds" of (F) refer to the result of the coöperative sales in the marketing area after complying with the equalization requirements.

---

[66] House Report No. 1241, 74th Cong., 1st Sess.; Senate Report No. 1011, 74th Cong., 1st Sess.

[67] *Costanzo* v. *Tillinghast*, 287 U. S. 341, 345; *United States* v. *Chicago North Shore R. Co.*, 288 U. S. 1, 13–14.

The defendant, Central New York Coöperative Association, raises for itself a final point. In determining the net pool obligation of any handler for milk received from producers,[68] the handler is authorized to subtract pro rata out of each class from the milk involved in the pool "the quantity of milk received from the handler's own farm." We have determined that this coöperative, though marketing milk under an agency contract with its members, is a handler subject to the Act and Order. The coöperative argues that as its members, farmers, would not need to account to the pool for their personal sales to consumers, the coöperative, being utilized as an agent to market the farmers' milk, is under no obligation to contribute to equalization. As the coöperative does not have its own farm but is itself a handler under the Act, it must pay into the producer settlement fund.

Inasmuch as all the defendants in these appeals are handling milk in interstate commerce, the petition for the enforcement of Official Order No. 126, issued under c. 383 of the Laws of 1937 of the State of New York, concerning milk not covered by Order No. 27 of the Secretary of Agriculture, should be dismissed.

The order of the District Court in Nos. 771, 827 and 828 is reversed and the causes are remanded to that Court with instructions to enter an order specifically enforcing up to the time of suspension the provisions of Order No. 27, issued by the Secretary of Agriculture August 15, 1938, regulating the handling of milk in the New York marketing area, as to all the defendants and enjoining defendants, their officers, agents and servants, from further violation of the Order.

The order of the District Court in dismissing the petition of Holton V. Noyes, as Commissioner of Agriculture and Markets of the State of New York, is affirmed.

---

[68] Article VI, § 1.

[Over.]

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS concur in the judgment and opinion of the Court except insofar as the opinion appears to imply that power of Congress to enact the marketing law depends upon the use and nature of milk. They do not believe that we are called upon in this case to indicate, as they think we do, that there is such a constitutional limitation on the power of Congress to regulate interstate commerce.

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER, dissenting.

We are of opinion that the decree below should be affirmed.

In our view the challenged order of the Secretary must succumb to two manifest objections. It is unnecessary for us to dissect the record in search of other impediments.

*First.* Congress possesses the powers delegated by the Constitution—no others. The opinion of this Court in *Schechter Poultry Corp.* v. *United States* (1935), 295 U. S. 495—noteworthy because of modernity and reaffirmation of ancient doctrine—sufficiently demonstrates the absence of Congressional authority to manage private business affairs under the transparent guise of regulating interstate commerce. True, production and distribution of milk are most important enterprises, not easy of wise execution; but so is breeding the cows, authors of the commodity; also, sowing and reaping the fodder which inspires them.

*Second.* If perchance Congress possesses power to manage the milk business within the various states, authority so to do cannot be committed to another. A cursory examination of the statute shows clearly enough the design to allow a secretary to prescribe according to his own errant will and then to execute. This is not government by law but by caprice. Whimseys may displace deliber-

ate action by chosen representatives and become rules of conduct. To us the outcome seems wholly incompatible with the system under which we are supposed to live.

MR. JUSTICE ROBERTS, dissenting.

In Nos. 772, 809 and 865* I have expressed my views as to the unconstitutionality of the provisions of the Agricultural Marketing Agreement Act of 1937 here involved, in view of their attempted delegation of legislative powers. That matter is not pressed in the present cases and I need not here advert to the subject. I am of opinion, nevertheless, that Order No. 27 is not, in the respects to be discussed, authorized by the Act, but if it is authorized, deprives the appellees of their property without due process of law in violation of the Fifth Amendment.

This conclusion is based upon findings of fact of the District Court. While the findings in question are the subject of assignments of error, the appellants failed, either in brief or in oral argument, to point out that they lack substantial support in the evidence. Examination of the record discloses that these findings are based on uncontradicted testimony, authentic documentary evidence, and a stipulation of the parties. They should, therefore, be accepted here. They may briefly be recapitulated.

Under the terms of the Act and the order, all of the appellees are handlers and the Dairymen's League Coöperative Association, the appellant in No. 827, is likewise a handler. By Art. VII, § 1, of the order, on or before the 25th day of each month, each handler which is not a coöperative association of producers is required to pay to each producer the uniform price fixed by the order for all milk delivered by the producer during the preceding month which was sold in the marketing area. The coöperative associations which are handlers are not required

---

*H. P. Hood & Sons, Inc. v. United States, post, 588, 603.

to make payment for similar milk at the uniform price or at any stated price. Art. VII, § 8, requires all handlers, on or before the 18th day of each month, to pay to the market administrator for the Producer Settlement Fund "the amount by which his net pool obligation for the preceding month is greater than the amount obtained by multiplying the net pooled milk of such handler by the uniform price." Thus each handler is required to pay into the fund for all milk used in the marketing area the difference between $2.45 per cwt. and the uniform price for all Class I milk. Handlers selling milk received from producers in the production area, but marketed outside the marketing area, (denominated "unpriced milk") are not required to pay a uniform price for such milk or to pay into the fund the difference between the uniform price and the actual market value of such milk, or any fixed amount in respect thereof. They are permitted to blend prices paid or purported to have been paid for unpriced milk with the uniform price announced by the Administrator for milk sold in the marketing area, thereby reducing the actual price paid by them for milk sold in the marketing area in competition with other handlers who sell milk only in that area. In a pamphlet issued by the Secretary, the provisions of the order are so construed and the method of accounting is described as follows:

"Thus, the handler may multiply the total pounds of milk sold by it in the area by the uniform price; multiply the total pounds of milk sold in other markets and which is called 'unpriced milk' by 'such prices as it sees fit;' add the totals, and divide by the total pounds of milk, to obtain the average of 'blended' price paid producers for all milk. If the price figured by the handler for unpriced milk, is lower than its actual market value, the handler, by blending, is thereby permitted to pay producers for all milk at less than the Order price, and less than the actual value thereof."

The appellees' receiving stations in the production area supply the marketing area defined by the order. The appellee, Jetter Dairy Company, sells milk in competition with dealers operating milk receiving stations in the production area in New York, who ship milk received at their stations to the marketing area. Other appellees buy milk which is sold to independent dealers in competition with milk received at the other stations in the producing area. Several of the appellees' largest competitors, including the Dairymen's League Coöperative, sell large proportions of their milk outside the marketing area in northern New Jersey. The Milk Control Board of New Jersey fixed a base price of $2.76 per cwt. to producers for 3.5 milk f. o. b. country milk plants, which price was in effect during the period covered by the order. The same Board fixed wholesale prices from dealers to stores at eleven cents per quart, bottled in glass, in two rural districts, and twelve cents per quart, in glass, in three heavily populated districts, and fixed a minimum price to consumers out of stores in the two rural districts of twelve cents per quart and, in the more heavily populated districts, of thirteen cents per quart. No resale prices are fixed in the marketing area either from dealers to stores or from stores to consumers. The fair market value of "unpriced" Class I milk produced in the production area, and sold by handlers in New Jersey, during the period the order was in force, was $2.76 per cwt.

Whereas the uniform price for 3.5 milk fixed by the Administrator was, for September, $1.87, October, $1.91, and November, $2.10 per cwt., the Dairymen's League paid its producers a base price for the same milk, in the same zone, for September, $1.75, for October, $1.81, and, for November, $2.01 per cwt. Thus the difference between the value of Class I milk sold by the Dairymen's League in New Jersey, and the prices paid for the same to producers per cwt. was, in September, $1.01, in Oc-

tober, $.95, and, in November, $.75.. $1.01 per cwt. on 10,208,500 pounds of milk sold in New Jersey by the Dairymen's League amounts to $103,105.85.

Sheffield Farms Company, a competitor of the appellees, utilized, in September, 1938, 40,083,075 pounds of Class I milk in New York State and 6,426,443 pounds of milk in New Jersey, as well as milk in other markets. For out of market or unpriced milk the company negotiated. with its producers to pay the uniform order price for such out of market milk. The base price paid was, therefore, $1.87, or eighty-nine cents per cwt. less than the price fixed by the New Jersey Control Board. The difference amounted to $57,194.96, or 14.27 cents per cwt. on such milk and the price paid for Class I milk was reduced by that amount. Similar spreads are shown in the company's purchases for October, 1938.

Based upon these facts, the court further finds that prices paid to producers delivering to handlers, whether coöperative or proprietary, which sell fluid milk in the marketing area, and also in the State of New Jersey and other markets, are less than the actual value of the milk delivered, due to the process of blending prices for milk sold outside of the marketing area, which bear no true relation to the actual value thereof, with prices charged for milk sold in the area.

It is evident from the terms of the order, and the Secretary's construction of it, that handlers who use "unpriced" milk may fix any price they choose to fix for it. Thus, contrary to the requirement of § 8c (5) (A), of the statute, all producers do not receive a uniform price for milk. This is a necessary effect of the provision permitting the blending of the price paid producers for milk sold in the marketing area and an arbitrary price fixed for "unpriced" milk. The effect upon a handler whose trade is solely in the marketing area is disastrous. The lower price paid by those who are permitted to blend makes it possible for them to resell the milk in the mar-

keting area, in which no resale price is fixed, at a cut rate which is destructive of their competitors' business. And there is evidence that handlers, coöperative and proprietary, have taken advantage of the terms of the order to cut the price of milk to consumers in the marketing area to the disadvantage of their competitors.

The appellants make no answer to the appellees' attack on this feature of the order. The opinion of this court states that the detriment to the smaller handlers who sell milk for use only in the marketing area is the result of competitive conditions which the order does not affect. But it is evident that the order freezes the minimum price which is to be paid by many handlers and leaves the price of other handlers who compete with them open to reduction by the device of blending.

There is nothing in the Act which authorizes the discrimination worked by the order permitting handlers, whether proprietary or coöperative, to blend the prices of unpriced milk with that of milk, sold in the marketing area. Section 8c (5) (F), as I read it, prohibits such a practice by coöperatives. If the order had provided that milk sold in New Jersey should be accounted for to the pool at its actual value and had the milk so sold been accounted into the pool, competitors could not have obtained the advantage which so seriously injures the business of appellees. As the order is drawn and administered it inevitably tends to destroy the business of smaller handlers by placing them at the mercy of their larger competitors. I think no such arrangement was contemplated by the Act, but that, if it was, it operates to deny the appellees due process of law.

I think that the decree should be affirmed.

The CHIEF JUSTICE joins in this opinion so far as it relates to the invalidity of the order on the ground stated; MR. JUSTICE McREYNOLDS and MR. JUSTICE BUTLER also join in this opinion.