# DUNBAR v. DUNBAR.

## ERROR TO THE SUPERIOR COURT OF THE STATE OF MASSACHUSETTS.

### No. 244. Argued April 16, 1903.—Decided June 1,·1903.

After obtaining a divorce on the ground of his wife's desertion, she not op-
posing the decree, the husband executed and delivered a written contract
by which he agreed to pay the wife a specified sum annually for her own
support during her life or so long as she remained unmarried, and also
to pay her a specified sum annually for the support of their minor chil-
dren whose custody was awarded by the decree to the wife. Subsequently
the husband was adjudged a bankrupt and discharged. The wife sued
for amounts accrued prior to the discharge both for her own support and
for that of her children.

*Held,* that as to the amount payable for her own support it was not a con-
tingent liability provable under the bankruptcy act, and the contract was
not of such a nature as would permit the obligor to be discharged from
the obligations thereunder by a discharge in bankruptcy.

*Held,* that as to the amount payable for the minor children, the contract
was a recognition of liability on the part of the father to support them
and, as it does not appear that the amount was unreasonable, the contract
to do so could not be affected by a discharge in bankruptcy ; and the fact
that the money was payable to the mother did not affect the situation.

THE defendant in error, being the plaintiff below, brought
her action in October, 1899, against the plaintiff in error, in the
Municipal Court of Boston, to recover moneys alleged to be
due upon a contract, which was set forth in the complaint. Is-
sue was joined and the case tried before a single justice, and judg-
ment ordered for the defendant with costs. An appeal was taken
to the Superior Court of the county of Suffolk, and that court or-
dered judgment for the plaintiff for one branch only of her claim.
The case was reported to the Supreme Judicial Court for the
Commonwealth, and that court ordered the court below to enter
judgment for the plaintiff for both branches of her claim, 180
Massachusetts, 170, and the case was remanded to the Superior
Court for the purpose of entering such judgment. Pursuant
to the directions of the Supreme Court, the Superior Court did
enter judgment against the defendant for both branches of her

claim, for the sum of $851.60 and costs. The defendant then obtained a writ of error from this court, directed to the Superior Court of Massachusetts, where the record remained.

The case shows these facts: The parties were husband and wife, who, in 1889, were living apart, the husband in Ohio and the wife in Massachusetts. In May, 1889, the attorney for her husband came to Massachusetts and saw Mrs. Dunbar, and told her that her husband was about to seek a divorce from her. The wife at this time had no means, and the two sons of the marriage, then respectively nine and twelve years old, were living with her. The purpose of the visit of the attorney was to obtain some assurance from her that she would not contest the case, and if she did not that the husband would make provision for aiding in the support of herself and her sons until they arrived of age. The wife denied any intended desertion of her husband, but the result of the negotiations after the wife had taken counsel of friends was to give assurance to the attorney that no defence would be interposed if he made some suitable provision for herself and her children.

Upon the return of the attorney to Ohio, a suit for divorce was commenced by the husband, and the summons served by publication. No appearance was made and there was no opposition to the decree of divorce which was obtained in July, 1889. It adjudged that the marriage contract theretofore existing between the parties was thereby dissolved, and both parties released from the obligation of the same, and "that the custody of the children of such marriage, one boy, Harry H. Dunbar, aged 12 years, and Willie W. Dunbar, aged 9 years, be, and the same are, to remain in charge and under the control of the said Lottie E. Dunbar, the said Horace B. Dunbar to have the privilege of seeing said children at all reasonable times."

The ground of divorce was stated, and the court found " upon the evidence adduced that the defendant has been guilty of wilful absence for more than three years last past from plaintiff, and that, by reason thereof, the plaintiff is entitled to a divorce as prayed for."

After the divorce the husband sent to a friend of his wife, to be delivered to her in performance of his agreement, a written

contract, in which he bound himself to pay to Lottie E. Dunbar, of Ashburnham, Mass., five hundred dollars yearly, so long as she remained unmarried, in monthly installments. In that contract he also agreed to pay "to our children, Harry H. Dunbar and Willie W. Dunbar, the sum of two hundred and fifty dollars each yearly, until they each attain the age of fourteen years; after that age they are to be paid by me such extra allowance as will give them a good and sufficient education befitting their station in life, and a suitable maintenance until each attains the age of twenty-one years." This writing was signed by the husband and acknowledged before a notary public of Hamilton, Ohio.

Payments upon this contract were made by the husband, but in 1896 they had become somewhat in arrears, and disputes arose as to the validity of the agreement. Thereafter another contract was entered into and payments were made as called for in that contract until some months prior to December 2, 1898. On such last named date the defendant was adjudged a bankrupt, on his voluntary petition in bankruptcy, in the United States District Court in Bankruptcy, Southern District of Ohio, Western Division, and on April 24, 1899, was discharged from all debts and claims provable under the act of Congress, relating to bankruptcy, against his estate, existing on the 2d day of December, 1898.

In the schedule of the defendant it appeared that he named the plaintiff as a creditor, as follows:

Lottie E. Dunbar, Charlestown, Mass. . . . $ 540
  Alimony due up to present time.
Lottie E. Dunbar, Charlestown, Mass. . . . 1300
  Alimony payable yearly.

The plaintiff at the first meeting of the creditors in bankruptcy proceedings, which was held before a referee appointed therein, appeared by an attorney, who produced and filed his power of attorney, and filed her claim for $691.63, for installments on the contract due to December 2, 1898. The husband had paid nothing on the contract since some time before December 2, 1898, and finally the wife commenced an action to recover the amounts due thereon.

The following is a copy of the contract sued on :

" Controversies having arisen concerning the agreement heretofore made between Horace B. Dunbar and Lottie E. Dunbar in September, 1899, in consideration of said Lottie E. Dunbar's forbearance of suit on such controversies, and in settlement of all such controversies and in substitution of said agreement of September, 1889, and in further consideration of the release by Lottie E. Dunbar and in satisfaction of all claims under said original agreement, Horace B. Dunbar agrees with the said Lottie E. Dunbar as follows :

" That said Horace B. Dunbar will pay to Lottie E. Dunbar during her life, or until she marries, for her maintenance and support, yearly, the sum of five hundred dollars, and will pay to her yearly for the support and maintenance of her child, Harry H. Dunbar, the sum of four hundred dollars until he shall attain the age of twenty-one years; and shall pay to her yearly for the support and maintenance of her child, Willie W. Dunbar, the sum of four hundred dollars until he shall attain the age of twenty-one years, all said sums to be paid in equal monthly installments between the first and tenth of each and every month—the first installment being for the month of May, 1896, shall be paid between the first and tenth of June, 1896.

" And, in addition to the foregoing, said Horace B. Dunbar agrees to pay the further sum of one hundred dollars between the first and tenth of July, 1896, over and above the installment otherwise due for said month.

" And the said Lottie E. Dunbar hereby agrees that she has not nor shall she have any other claim or demand against Horace B. Dunbar for contribution to her support and maintenance, or for the support, maintenance or education of said children, save and except as fixed and limited by this agreement."

Properly signed by both parties and witnessed.

The particulars of her claim were stated as follows :

" Horace B. Dunbar to Lottie E. Dunbar                    Dr.
1. To installments due under covenant for alimony from December, 1898, to October 1, 1899, ten months, at $41.66 a month    .    .    .    .    $416 60

Amount brought forward,            :        $416 60
2. To monthly allowance due her for support and
    maintenance of Willie W. Dunbar, from Decem-
    ber, 1898, to October 1, 1899, ten months, at
    $33.33 a month   .     .     .     .     .     ..        333 30
                                                           $749 90 "

The defendant pleaded his discharge in bankruptcy as a bar,
and the Supreme Judicial Court of the State held that it was
not good.

Mr. James Hamilton Lewis and Mr. George Fred Williams
for plaintiff in error. Mr. James A. Halloran was on the brief.

Mr. Frank H. Stewart for defendant in error. Mr. John
Oscar Teele was on the brief.

MR JUSTICE PECKHAM, after making the foregoing statement
of facts, delivered the opinion of the court.

Had the provisions of this contract, so far as contracting to
pay money for the support of his wife is concerned, been em-
bodied in the decree of divorce which the husband obtained
from his wife in Ohio on the ground of desertion, the liability
of the husband to pay the amount as alimony, notwithstand-
ing his discharge in bankruptcy, cannot be doubted. *Audubon*
v. *Shufeldt*, 181 U. S. 575. We are not by any means clear
that the same principle ought not to govern a contract of this
nature when, although the judgment of divorce is silent upon
the subject, it is plain that the contract was made with refer-
ence to the obligations of the husband to aid in the support of
his wife, notwithstanding the decree. The facts appearing in
this record do not show a case of any moral delinquency on
the part of the wife, and the contract, considering the circum-
stances, might possibly be held to take the place of an order or
judgment of the court for the payment of the amount, as in the
nature of a decree for alimony. We do not find it necessary,
however, to decide that question in this case, because in any

event we think the contract as to the support of the wife is not of such a nature as to be discharged by a discharge in bankruptcy.

Conceding that the bankruptcy act provides for discharging some classes of contingent demands or claims, this is not, in our opinion, such a demand. Even though it may be that an annuity dependent upon life is a contingent demand within the meaning of the bankruptcy act of 1898, 30 Stat. 544, yet this contract, so far as regards the support of the wife, is not dependent upon life alone, but is to cease in case the wife remarries. Such a contingency is not one which in our opinion is within the purview of the act, because of the innate difficulty, if not impossibility, of estimating or valuing the particular contingency of widowhood. A simple annuity which is to terminate upon the death of a particular person may be valued by reference to the mortality tables. Mr. Justice Bradley, in *Riggin* v. *Magwire*, 15 Wall. 549, speaking for the court, said that so long as it remained uncertain whether a contract or engagement would ever give rise to an actual duty or liability, and there was no means of removing the uncertainty by calculation, such contract or engagement was not provable under the bankruptcy act of 1841. The fifth section of that act gave the right to prove "uncertain and contingent demands," but it was held that a contract such as above described was not within that section.

It was remarked by the justice in that case that if the contract had come within the category of annuities and debts payable in future, which are absolute and existing claims, the value of the wife's probability of survivorship after death of her husband might have been calculated on the principles of life annuities.

But how can any calculation be made in regard to the continuance of widowhood when there are no tables and no statistics by which to calculate such contingency? How can a valuation of a probable continuance of widowhood be made? Who can say what the probability of remarrying is in regard to any particular widow? We know what some of the factors might be in the question; inclination, age, health, property, attractiveness, chil-

dren. These would at least enter into the question as to the probability of continuance of widowhood, and yet there are no statistics which can be gathered which would tend in the slightest degree to aid in the solving of the question.

In many cases where actions are brought for the violation of contracts, such as *Pierce* v. *Tennessee Coal &c. Railroad Company,* 173 U. S. 1; *Roehm* v. *Horst,* 178 U. S. 1, and *Schell* v. *Plumb,* 55 N. Y. 592, it is necessary to come to some conclusion in regard to the damages which the party has sustained by reason of the breach of the contract, and in such cases resort may be had to the tables of mortality, and to other means of ascertaining as nearly as possible what the present damages are for a failure to perform in the future, but we think the rules in those cases are not applicable to cases like this under the bankruptcy act.

Taking the liability as presented by the contract, if the mortality tables were referred to for the purpose of ascertaining the value so far as it depended upon life, the answer would be no answer to the other contingency of the continuance of widowhood; and if having found the value as depending upon the mortality tables you desire to deduct from that the valuation of the other contingency, it is pure guesswork to do it.

It is true that this has been done in England under the English bankruptcy act of 1869. In *Ex parte Blakemore,* L. R. 5 Ch. D. 372 (1877), it was held by the court of appeal that the value of the contingency of a widow's marrying again was capable of being fairly estimated, and that proof must be admitted for the value of the future payments as ascertained by an actuary. That decision was made under the thirty-first section of the bankruptcy act of 1869. James, Lord Justice, said:

"No doubt it is uncertain whether the appellant will marry again, just as the duration of any particular life is uncertain. But, though the duration of a particular life is uncertain, the expectation of life at a given age is reduced to a certainty when you have regard to a million of lives. The value of the expectation of life is arrived at by an average deduced from practical experience."

Although the English statute makes it necessary to arrive at a conclusion upon this point, yet there is no " practical experience "

as to the chances of the continuance of widowhood, such as may be referred to where the probable continuance of life is involved. In the latter case we have the experience tables in regard to millions of lives, and under such circumstances there is, as Lord Justice James said, almost a certainty as to the valuation to be put on such a contingency. But under the English statute, the thirty-first section makes every kind of debt or liability provable in bankruptcy except demands in the nature of unliquidated damages arising otherwise than by reason of a contract or promise, so long as the value of the liability is "capable of being ascertained by fixed rules, or assessable only by a jury, or as matter of opinion." So under that act, in *Ex parte Neal,* L. R. 14 Ch. D. 579, there was a separation deed between husband and wife, and the husband was to pay an annuity to the wife, which was terminable " in case the wife should not lead a chaste life ; in case the husband and wife should resume cohabition ; and in case the marriage should be dissolved in respect of any thing done, committed, or suffered by " the other party, after the date of the deed. The annuity was also to be proportionately diminished in the event of the wife's becoming entitled to any income independent of the husband, exceeding a certain amount a year. After the execution of the deed the husband went through bankruptcy, and it was held that the value of the annuity was capable of being fairly estimated, and was provable in the liquidation. In that case, speaking of the thirty-first section of the act of 1869, it was stated that " words more large and general it is impossible to conceive ; they cover every species of contingency." It was also stated that it was "difficult to see how any case could arise which would not come within " the language of this act. Bramwell, Lord Justice, said : " But for the present bankruptcy act our decision must have been the same as that in *Mudge* v. *Rowan,*" L. R. 3 Ex. 85 (1868), but he said that the present bankruptcy act was very different in its terms from the act which was in force when that case was decided.

In the case of *Mudge* v. *Rowan, supra,* there was a deed of separation between husband and wife, in which the husband covenanted to pay an annuity to his wife by quarterly installments, the annuity to cease in the event of future cohabitation

by mutual consent. It was held that this was not an annuity provable under the bankruptcy act of 1849, 12th and 13th Vic. ch. 106, section 175; nor a liability to pay money under the 24th and 25th Vic. ch. 134, section 154.

The one hundred and seventy-fifth section of the act of 1849 expressly provided that the creditor might prove for the value of any annuity, which value the court was to ascertain. Kelly, Chief Baron, said:

"The annuity seems to me to be so uncertain in its nature as to be impossible to be valued. In many cases the Commissioner of Bankruptcy may have to deal with contingencies the value of which depends on a variety of considerations, and where the valuation is very difficult. But here I am at a loss to see any single circumstance upon which a calculation of any kind could be based."

Martin, Baron, said:

"This contingency depends on an infinite variety of circumstances, into which it is idle to suppose a commissioner could inquire."

Channell, Baron, concurring, said:

"The tendency of recent legislation, and the course of recent decisions, has been to free a debtor who becomes a bankrupt from all liability of every kind; but I do not think an order of discharge a bar to such a claim as the present. . . . I quite admit that, to bring an annuity within the act of 1849, it is not necessary to have any actual pecuniary consideration. I also feel that in many cases the difficulty of calculating the present value of contingencies may be very great, and yet they may be within the acts. But here it appears to me that the difficulty is insuperable."

In *Parker* v. *Ince*, 4 H. & N. 53 (1859), there was a bond conditioned to pay an annuity during the life of the obligor's wife, provided that if the obligor and his wife should at any time thereafter cohabit as man and wife the annuity should cease, and it was held that the annual sum thus covenanted to be paid by the defendant was not an annuity within the one hundred and seventy-fifth section of the bankruptcy law or consolidation act of 1849, nor a debt payable upon a contingency

within the one hundred and seventy-seventh section, nor a liability to pay money upon a contingency within the one hundred and seventy-eighth section, and consequently the discharge in bankruptcy was no bar to an action for a recovery of a quarterly payment due on the bond. Martin, Baron, said:

"That cannot be such an annuity as would fall within the one hundred and seventy-fifth section, because a value cannot be put upon it. How is it possible to calculate the probability of a man and his wife who are separated living together again? Their doing so depends upon their character temper, and disposition, and it may be a variety of other circumstances. Then is it money payable upon a contingency within the one hundred and seventy-eighth section? I think it is not."

It is only, therefore, by reason of the extraordinarily broad language contained in the thirty-first section of the English bankruptcy act of 1869 that the English courts have endeavored to make a fair estimate of the value of a contract based on the continuance of widowhood, even though the value was not capable of being ascertained by fixed rules, nor assessable by a jury, but was simply to be estimated by the opinion of the court or of some one entrusted with the duty.

In the *Blakemore* case, L. R. 5 Ch. D. 372, *supra*, after the announcement of the judgment, the report states that it was then arranged that it should be referred to an actuary to ascertain the annuity as a simple life annuity, and to deduct from that value such a sum as he should estimate to be the proper deduction for the contingency of widowhood. In other words, it was left to the actuary to guess the proper amount to be deducted.

No such broad language is found in our bankruptcy act of 1898. Section 63*a* provides for debts which may be proved, which, among others, are (1) "A fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition against him, whether then payable or not, with any interest thereon which would have been recoverable at that date or with a rebate of interest on such as were not then payable and did not bear interest;" (4) "founded upon an open account, or upon a contract express or implied."

In section 63*b* provision is made for unliquidated claims against the bankrupt, which may be liquidated upon application to the court in such manner as it shall direct, and may thereafter be proved and allowed against his estate. This paragraph *b*, however, adds nothing to the class of debts which might be proved under paragraph *a* of the same section. Its purpose is to permit an unliquidated claim, coming within the provisions of section 63*a*, to be liquidated as the court should direct.

We do not think that by the use of the language in section 63*a* it was intended to permit proof of contingent debts or liabilities or demands the valuation or estimation of which it was substantially impossible to prove.

The language of section 63*a* of the act of 1898 differs from that contained in the bankruptcy act of 1867, and also from that of 1841. The act of 1867, section 19, 14 Stat. 517, 525, carried into the Revised Statutes as section 5068, provided expressly for cases of contingent debts and contingent liabilities contracted by the bankrupt, and permitted applications to be made to the court to have the present value of the debt or liability ascertained and liquidated, which was to be done in such manner as the court should order, and the creditor was then to be allowed to prove for the amount so ascertained.

Section 5 of the act of 1841, 5 Stat. 440, provides in terms for the holders of uncertain or contingent demands coming in and proving such debts under the act. But neither the act of 1841 nor that of 1867 would probably cover the case of such a contract as the one under consideration.

Cases have been cited showing some contingent debts which were held capable of being proved under the bankruptcy act of 1898, among which are *Moch* v. *Market Street National Bank*, 107 Fed. Rep. 897, Circuit Court of Appeals, Third Circuit, 1901, and *Cobb* v. *Overman*, 109 Fed. Rep. 65, Circuit Court of Appeals, Fourth Circuit, 1901. And under former bankrupt acts, the cases of *Fisher* v. *Tifft*, 12 R. I. 56 (1878); *Heywood* v. *Shreve*, 44 N. J. L. 94 (1882), and *Shelton* v. *Pease*, 10 Missouri, 473 (1847).

The contingency in the case of *Moch* v. *National Bank, supra*, was that the bankrupt was the endorser of commercial paper

not due at the time of filing the petition, and it was held that under section 63a, subdivision 4, the creditor might prove against the estate of the bankrupt after the liability had become fixed.

In *Cobb* v. *Overman, supra,* the bond of the bankrupt to secure payment to the obligee of an annuity for life was held to be properly proved under section 63a, clause 1.

These cases, it will be seen, do not come within the principle of the case at bar. The other cases, arising under the acts of 1867 and 1841, do not affect this case.

The Massachusetts court held the debt herein not provable, upon the authority of *Morgan* v. *Wordell,* 178 Massachusetts, 350, and *Goding* v. *Roscenthal,* 180 Massachusetts, 43. Mr. Justice Barker, in delivering the opinion of the Supreme Judicial Court of Massachusetts in the latter case, said:

"But in *Morgan* v. *Wordell,* 178 Massachusetts, 350, this court assumed that such claims were not provable under the act, and we follow that view in the present case."

We think the contract, so far as it related to the payment to the wife during her life or widowhood, was not a contingent liability provable under the act of 1898.

In relation to that part of the husband's contract to pay for the support of his minor children until they respectively became of age, we also think that it was not of a nature to be proved in bankruptcy. At common law, a father is bound to support his legitimate children, and the obligation continues during their minority. We may assume this obligation to exist in all the States. In this case the decree of the court provided that the children should remain in the custody of the wife, and the contract to contribute a certain sum yearly for the support of each child during his minority was simply a contract to do that which the law obliged him to do; that is, to support his minor children. The contract was a recognition of such liability on his part. We think it was not the intention of Congress, in passing a bankruptcy act, to provide for the release of the father from his obligation to support his children by his discharge in bankruptcy, and if not, then we see no reason why his contract to do that which the law obliged him to do

should be discharged in that way. As his discharge would not in any event terminate his obligation to support his children during their minority, we see no reason why his written contract acknowledging such obligation and agreeing to pay a certain sum (which may be presumed to have been a reasonable one) in fulfillment thereof should be so discharged. · It is true his promise is to pay to the mother, but on this branch of the contract it is for the purpose of supporting his two minor children, and he simply makes her his agent for that purpose.

In *In re Baker*, 96 `Fed. Rep. 954, in the District Court of Kansas, it was held that a judgment in a bastardy proceeding against the putative father, adjudging him to pay a certain sum to the mother of the child for its maintenance, was not such a debt as would be released by the discharge of the father in bankruptcy, and it was put upon the ground that by virtue of the judgment and bond given thereon, the father became liable for the maintenance of the illegitimate son the same as if he were his legitimate offspring, and that the bankruptcy law was never intended to affect the liability of the father for the support of his children.

In the case of *In re Hubbard*, 98 Fed. Rep. 710, the District Court of Illinois held that a discharge in bankruptcy did not release the bankrupt from the obligation to obey an order made by a state court requiring him to pay a certain sum for the support of his minor children. Kohlsaat, District Judge, said :

" The bankruptcy act was passed to relieve persons bringing themselves within its provisions from the incubus of hopeless indebtedness, but it was not intended to, nor does it, subvert the higher rule, which casts upon a parent the care and maintenance of his offspring. The welfare of the State, as also every principle of law, statutory, natural, and divine, demand that, so long as he has any substance at all, he shall apply it to the maintenance of his children. Creditors, as well as all citizens, are interested in the enforcement of this rule."

As the defendant would still remain liable for the support of his minor children, even if discharged from this contract under the act, and he would remain liable for past support, why should it be held that Congress intended that such a contract, to do what

the law enjoins upon him as a duty, should be released? There is no language in the act which plainly so provides, and we ought not to infer it.

The amendments to the bankruptcy act passed in 1903, 32 Stat. 797, contain an amendment of section 17 of the act of 1898, which relates to debts not affected by a discharge, and it provides, among those not released by a discharge in bankruptcy, a debt due or to become due for alimony, or for the maintenance or support of wife or child. It is true that the provisions of the amendatory act are not to apply to cases pending before their enactment. They are only referred to here for the purpose of showing the legislative trend in the direction of not discharging an obligation of the bankrupt for the support and maintenance of wife or children.

The judgment is

*Affirmed.*