## In re SHAWSHEEN DAIRY, Inc.
### No. 65582.

District Court, D. Massachusetts.
Oct. 26, 1942.

Walter Bates Farr and Howard C. Connor, both of Boston, Mass., for petitioner.

Reuben Hall, of Boston, Mass., för Martin J. Witte, Trustee in Bankruptcy.

Joseph P. Rooney, Asst. U. S. Atty., and Edmund J. Brandon, U. S. Atty., both of Boston, Mass., and John S. L. Yost, of Washington, D. C., Sp. Asst. to the Atty. Gen., for the Market Administrator and for the United States of America, amici curiae.

WYZANSKI, District Judge.

This case is here on petition to review an order of Referee Thompson. His order approves a compromise based in part upon proof of claims presented in bankruptcy by the Market Administrator acting under the authority of the Agricultural Marketing Agreement Act of 1937, Act of June 3, 1937, c. 296, 50 Stat. 246, as amended, 7 U.S.C.A. § 608c, and Order No. 4, as amended, regulating milk in the Greater Boston Market 7 C.F.R., 1940 Supp. Part 904. An objecting creditor seeks to upset the compromise on the ground that the claims are not provable in bankruptcy either as debts founded upon "an open account, or upon a contract express or implied", Section 63 sub. a(4) of the Bankruptcy Act, as amended, Act of June 22, 1938, c. 575, 52 Stat. 873, 11 U.S.C.A. § 103, sub. a(4), or otherwise.

The general nature of these claims is explained in United States v. Rock Royal Co-op. 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; H. P. Hood & Sons, Inc., v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478, and Green Valley Creamery, Inc., v. United States, 1 Cir., 108 F.2d 342. Congress, acting under its power to regulate commerce among the several states, authorized the Secretary of Agriculture to promulgate milk marketing orders. The Secretary used his authority to issue an order for the Boston area. That order provides that each handler of milk shall make "advance payments" at stipulated rates to those who produce milk for him. It then provides that each handler shall make "final payments" to, or receive payments from, an equalization pool,—the determination depending upon whether his "advance payments" to his producers are less than or exceed "the value of milk" as finally computed under the order. 7 C.F.R., 1940 Supp. § 904.8(3), derived from Articles VII and VIII of Order No. 4 as originally issued, February 7, 1936. These debits and credits are balanced periodically in the form of "producer settlement" accounts. The order

contemplates, § 904.2, and the Secretary has appointed, a Market Administrator. The order authorizes that official to incur "market administration" expenses and to assess them to the handlers. Section 904.10 derived from Article X of the Order of February 7, 1936. It also authorizes him to incur expenses for "marketing services" such as weighing, sampling and testing milk, and in turn to assess those expenses to the handlers. Section 904.9 derived from Article IX of the Order of February 7, 1936. For present purposes the parties have assumed that the act and order give the Market Administrator whatever powers the Secretary may have to make proof of claims in bankruptcy.

The compromise under review involves principally "producer settlement" claims against the bankrupt handler; although it also covers some claims against the bankrupt for "market administration" and perhaps some for "marketing services".

■ It is fundamental that a claim is provable in bankruptcy only if Congress has so provided. Schall v. Camors, 251 U. S. 239, 40 S.Ct. 135, 64 L.Ed. 247. The Market Administrator says his claims fall within the category of "debts * * * founded upon * * * an open account, or a contract express or implied", for which Congress made provision in Section 63 sub. a(4) of the Bankruptcy Act. He places no reliance on the phrase "open account" (since admittedly he made his computations and submitted his accounts only after the debtor had been adjudicated a bankrupt), but urges that there is a contract express or implied.

It would not be unreasonable to conclude that at least the "producer settlement" claims rested upon express contracts or, rather, implied terms of express contracts. The bankrupt had voluntarily and expressly agreed to buy milk from producers, and each agreement of purchase included a covenant imposed by law to make "advance payments" to producers at stipulated rates and to make "final payments" "to producers, through the market administrator, by paying to" the equalization pool sums determined by him. § 904.8. An obligation which the law compels parties to incorporate into a voluntary contract might well be denominated a debt founded upon an express contract. Winfield, The Law of Tort, p. 181; cf. Cunningham v. Commissioner of Banks, 249 Mass. 401, 424–427, 144 N.E. 447. But I shall not rest my decision on

that theory, not only because it might not reach the "market administration" and "marketing service" claims, but also because it does not entirely harmonize with the reasoning of Mr. Justice Cardozo in Brown v. O'Keefe, 300 U.S. 598, 606, 607, 57 S.Ct. 543, 81 L.Ed. 827, or with what seems to me the doubtful result in Lane v. Industrial Commissioner, 54 F.2d 338.

■■ There is, however, no similar difficulty in bringing these claims within the phrase "debts founded upon a contract implied". "The expression 'implied contract' has been used to denote not only a genuine contract established by inference, but also an obligation which does not arise from any real contract, but which can be enforced as. if it had a contractual origin." Lindley L. J. in In re Rhoades, 44 Ch. D. at 70. And, as used in the Bankruptcy Act, the expression has been regarded as broad enough to embrace an obligation written by statute into a contract (Brown v. O'Keefe, and Cunningham v. Commissioner of Banks, both supra), or an obligation resulting from the unjust enrichment of the bankrupt's estate through his misuse of a creditor's property. Kreitlein v. Ferger, 238 U.S. 21, 27, 35 S.Ct. 685, 59 L.Ed. 1184; Crawford v. Burke, 195 U.S. 176, 193, 25 S.Ct. 9, 49 L. Ed. 147. See Williston, Contracts, 2d Ed., § 1986; Note, 31 Michigan Law Review 389.

■ Either of those two lines of authority might serve as ground for allowing proof of the "settlement producer" claims at bar: those claims are founded upon obligations written by Order No. 4 into each contract to purchase milk in the Boston area; and the bankrupt's estate was enriched by the acquisition of producers' milk for which the bankrupt never fully paid. Yet such reasoning cannot readily be extended to the claims for "market administration" and "marketing services". I, therefore, prefer to invoke the broader principle that the expression "contract implied" as used in the Bankruptcy Act covers a statutory obligation to pay money (National Labor Relations Board v. Killoren, 8 Cir., 122 F.2d 609, 612, 137 A.L.R. 510, back pay award under National Labor Relations Act, 29 U.S.C.A. § 151 et seq.; and see the many law review notes on that decision referred to in the Index to Legal Periodicals), at least where the obligation is not a penalty or forfeiture within Section 57 sub. j of the Bankruptcy Act, 11 U.S.C.A. § 93 sub. j; is not a consequence of wrongful conduct (Standard Oil Co. v. Back Bay

Hotels Garage, 285 Mass. 129, 135, 188 N.E. 619); is not a modern equivalent for an antique tort Lane v. Industrial Commissioner, 2 Cir., 54 F.2d 338, 86 A.L.R. 765. Cf. Story v. Sheard (1892) 2 Q. B. 515, 517; and is not so personal as to make it against public policy to allow the obligation to be extinguished by the bankrupt's discharge. Cf. Dunbar v. Dunbar, 190 U.S. 340, 23 S.Ct. 757, 47 L.Ed. 1084 (alimony).

History readily supports the view that such a statutory obligation is a "contract implied". Despite the doubts expressed by Chief Justice Holt, (City of York v. Toun, 5 Mod. 444 (1698) commented on by James Barr Ames, The History of Assumpsit, 2 Harv.L.Rev. 53, 65,) the books make it plain that from the end of the seventeenth century an action for indebitatus assumpsit lay to enforce a statutory, official or customary duty. Mayor of London v. Goree, 3 Keb. 766, 2 Lev. 174, 1 Vent. 298, Freem. 433 (1676); Mayor of London v. Hunt, 3 Lev. 37 (1681); Shuttleworth v. Garnet, 3 Lev. 261 (1689); see footnote (a) appended by the reporter to City of York v. Toun, supra; Ames, supra; Ames, Lectures on Legal History, Lecture XIV "Implied Assumpsit", pp. 149–166, especially pp. 160, 161; Holdsworth, A History of English Law, vol. VIII, pp. 90, 96; Winfield, The Law of Tort, p. 126. Two of the older cases are peculiarly pertinent here. Indebitatus assumpsit lay in Goree's case for scavage, a toll exacted for exposing for sale foreign wares entered in the custom house; and in Hunt's case for weighage, a toll of "8d. per ton for every ton of cheese brought from any part of England to the Port of London, ab oriente de London-bridge".

The fact that indebitatus assumpsit was the accepted form of action shows that the cause was quasi-contractual. See Ames, Holdsworth and Winfield, all supra. And it is on that common law procedural ground, not on some eighteenth century theory of social contract (See the comment of Holdsworth, supra, vol. VIII, p. 96 on the reference in Blackstone, Commentaries, Bk. III, p. 159 to "an implied original contract to submit to the rules of the community whereof we are members"), that modern authorities agree that a statutory, official or customary duty is quasi-contractual. Steamship Co. v. Joliffe, 2 Wall. 450, 456, 457, 17 L.Ed. 805; National Labor Relations Board v. Killoren, supra; Ames, Lectures on Legal History, supra, p. 160; Jackson, History of Quasi-Contract, p. 29; Keener, Quasi-Contracts, pp. 16, 17; and Woodward, Quasi-Contracts, p. 1.

Being contractual in nature, a statutory obligation may be proved without violence to the policy of the Bankruptcy Act, at least where the obligation is not a penalty or forfeiture, is not a consequence of wrongful conduct, is not a modern equivalent of an antique tort, and is not so personal that public policy favors its survival after a discharge in bankruptcy. The general policy of the Bankruptcy Act has always been "to relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes". Williams v. United States Fidelity Co., 236 U.S. 549, 554, 35 S.Ct. 289, 290, 59 L.Ed. 713; Maynard v. Elliott, 283 U.S. 273, 277, 51 S.Ct. 390, 75 L.Ed. 1028. To be sure, this policy does not mean that all debts are provable and dischargeable, though the tendency in that direction may have been accelerated by the pressure of the recent economic depression and by the recognition that since business is today conducted largely through corporate organizations, the refusal to permit the proof of a claim in bankruptcy often operates to extinguish its practical value after bankruptcy. Compare, for example, the liberalizing provisions of Section 4 of the Act of June 7, 1934, c. 424, 48 Stat. 911, 923 and of Section 1 of the Act of June 22, 1938, c. 575, 52 Stat. 873, both compiled in 11 U.S.C.A. § 103. See Glenn, Liquidation, § 466, p. 644. Yet there remain several types of claims which are, to a greater or less extent, non-provable. Of these, the ones on which the petitioner at bar draws for analogies are claims arising out of fines and out of torts.

Congress refused to sanction proof of penalties and forfeitures because those exactions are intended to punish the bankrupt. Allowing proof of such claims would punish only creditors. Allowing discharge of such claims would relieve a criminal of the burden of his wrongdoing. Those considerations are inapplicable to the claims compromised in the instant case. Obligations imposed by §§ 904.8 (3), 904.10 and 904.9 of Order No. 4, as amended, for "producer settlements", "market administration" and "marketing services" are in no sense fines for bad conduct. They are fiscal devices for regulating prices. See United States v. Rock Royal Co-op., supra, 307 U. S. page 572, 59 S.Ct. 993, 83 L.Ed. 1446.

498

The assessments are made to equalize economic advantage, not to punish anti-social behavior.

 Congressional failure to permit proof of tort claims, save as recently provided (See Section 4 sub. a (6½) of the Act of June 7, 1934, c. 424, 48 Stat. 911, 923 and Section 1 sub. a(7) of the Act of June 22, 1938, c. 575, 52 Stat. 873, both compiled in 11 U.S.C.A. § 103), was due to English precedent; or to the fact that those claims are contingent in validity and amount until determined by a verdict of a jury to which the bankrupt would usually have been entitled; or to the theory that the general scope of bankruptcy legislation was to cover the type of mercantile debts incurred by traders (Schall v. Camors, 251 U.S. 239, 250, 40 S.Ct. 135, 64 L.Ed. 247); or to the historical roots of tort liability which gave it such a quasi-criminal cast that, in accordance with the maxim actio personalis moritur cum persona, the burden of the wrong could not at common law be imposed upon a successor of the tortfeasor. See Glenn, supra. None of those considerations applies to "producer settlement", "market administration" or "market service" claims. There is no hostile English precedent. The bankrupt would never have had a right to a jury trial. Section 8a (6) of the Agricultural Marketing Agreement Act; 7 U.S.C.A. § 608a (6). United States v. Rock Royal Co-op., supra, 307 U.S. page 546, 59 S.Ct. 993, 83 L.Ed. 1446. These obligations are precisely ascertainable by mathematical computations. Moreover, representing unpaid contributions to industry pools and unpaid regulatory fees, they are just the sort of debts which traders frequently incur and about which they customarily complain as the cause of their poor financial showing. And they are obligations which under neither modern (Compare Standard Oil Co. v. Back Bay Hotels Garage, supra, director's liability) nor older notions (Compare Lane v. Industrial Commissioner, supra, employer's liability for workmen's compensation act claims), would be regarded as ex delicto. I, therefore, conclude that the claims were provable as "debts founded upon a contract implied", and could be properly compromised.

I need not consider whether the claims compromised were also provable as "debts owing to the United States", Section 57, sub. j, of the Bankruptcy Act, 11 U.S.C.A. § 93 sub. j, or were preferred on that account. R.S. § 3466; U.S.C.A. Ti. 31, § 191. Compare Bramwell v. United States Fidelity Co., 269 U.S. 483, 487, 46 S.Ct. 176, 70 L.Ed. 368. See Note 9 University of Chicago Law Review 326, 328. Nor need I consider whether the reference made to the unemployment compensation cases in footnote 22 page 561 of the opinion in 307 U.S., 59 S.Ct. 993, 83 L.Ed. 1446, United States v. Rock Royal Co-op., supra, implies that the claims at bar could have been treated like unemployment compensation claims and brought under the preferred rubric of taxes. Even though some courts have held that contributions made to unemployment compensation funds are to be treated as taxes for bankruptcy purposes, regardless of whether the particular unemployment compensation law purports to be an exercise of the police power (In re Oshkosh Foundry Co., D.C.E.D.Wis., 28 F.Supp. 412; In re Berkshire Hardware Co., D.C.Mass., 39 F.Supp. 663; compare Howes Bros. Co. v. Massachusetts Unemployment Compensation Commission, 296 Mass. 275, 282, 288, 289, 5 N.E.2d 720, but see State of New Jersey v. Anderson, 203 U.S. 483, 491, 27 S.Ct. 137, 51 L.Ed. 284, second full paragraph); or an exercise of the taxing power (United States v. New York, 315 U.S. 510, 62 S.Ct. 712, 86 L.Ed. 998; In re William Akers, Jr., Co., Inc., 3 Cir., 121 F.2d 846, 135 A.L.R. 1503), and even though analytically it is perplexing to distinguish between "producer settlements" payable to a milk equalization pool and employer contributions payable to an unemployment compensation pool, it may be that a bankruptcy court faced squarely with the issue would decide that "producer settlement", "market administration" and "marketing service" claims were not taxes because the Agricultural Marketing Agreement Act has been sustained as an exercise of the Congressional power to regulate commerce, not as an exercise of the Congressional power to lay taxes. (United States v. Rock Royal Co-op., supra, 307 U.S. at pages 568–570, 59 S.Ct. 993, 83 L.Ed. 1446; compare Edye v. Robertson, 112 U.S. 580, 595, 5 S.Ct. 247, 28 L.Ed. 798); and because a contrary decision would create such anomalies as placing unpaid claims for "final payments" to producers ahead of unpaid claims for "advance payments" to producers.

Referee's order affirmed.