529 F.2d 1264
 In the Matter of Johnnie WILLIAMS, whose wife is Mytris Gene
Williams, Bankrupt-Appellee,
v.
DEPARTMENT OF SOCIAL AND HEALTH SERVICES, STATE OF
WASHINGTON, Creditor-Appellant.
 No. 73--3582.
 United States Court of Appeals,
Ninth Circuit.
 Jan. 20, 1976.
 
 1
 Kenneth MacIntosh, Asst. Atty. Gen. (argued), Seattle, Wash., for creditor-appellant.
 
 
 2
 John Sennhauser (argued), Legal Services Center, Seattle, Wash., for bankrupt-appellee.
 
 OPINION
 
 3
 Before MERRILL and TRASK, Circuit Judges, and LUCAS,* District Judge.
 
 LUCAS, District Judge:
 
 4
 The Department of Social and Health Services, State of Washington, appeals from an October 26, 1973 order entered in the District Court for the Western District of Washington affirming the Referee in Bankruptcy's decision that the bankrupt-appellee's obligation to the Department for unpaid child support pursuant to RCW 74.20A.010 et seq.[1] was discharged in bankruptcy. Both parties have stipulated to the pertinent facts.
 
 
 5
 In a divorce decree dated June 14, 1967, the bankrupt Johnnie Williams, was ordered to pay $33.33 per month per child for the support of his two minor children, who were awarded to the custody of their mother. The bankrupt has subsequently remarried and become responsible for the support of a stepdaughter and son living with him and his second wife.
 
 
 6
 From September 1969 through February 1972, the bankrupt paid only $135.00 in child support for the offspring by his first marriage, the Department meanwhile paying to their mother for their support $1,864.80 in public-assistance benefits of the category Aid to Families with Dependent Children (AFDC). On April 19, 1972, the Department filed a lien for that amount on the bankrupt's wages pursuant to RCW 74.20A.060 et seq. Notice of the lien was served on the bankrupt's employer, Bethlehem Steel Corporation, on April 27, 1972. Under RCW 74.20A.090, 50% of the debtor's disposable earnings are exempt from such a child-support lien. During the time the lien was placed upon the bankrupt's wages, his earnings averaged approximately $600.00 gross and $440.00 net income per month. Prior to the filing on June 9, 1972, of the petition in bankruptcy which duly scheduled the support lien, $420.39 was withheld from the bankrupt's check and paid to the Department. Subsequent to the filing of the petition and prior to the suspension of the lien, $397.81 was similarly withheld and paid to appellant. Effective August 1, 1972, pending final determination of this matter including all appeals, enforcement of the lien was suspended and the bankrupt effected a wage assignment to the Department for the full amount of current support owed his two minor children, $66.66 per month. The order affirmed by the district court required the Department to repay the $397.81 withheld after the filing of the petition in bankruptcy, and enjoined further attempts to enforce the debt to the Department for unpaid child support.
 
 
 7
 It is uncontroverted that the discharge in bankruptcy did not affect the right of the bankrupt's ex-wife to enforce the divorce court's award for the support of their minor children. Whether the bankrupt's obligation to the Department under RCW 74.20A.010 et seq. is also exempt from discharge is the single issue on appeal and is resolved by construction of Section 17(a)(7) of the Bankruptcy Act, 11 U.S.C. § 35(a)(7).[2] That section provides, in pertinent part:
 
 
 8
 'A discharge in bankruptcy shall release a bankrupt from all his provable debts, whether allowable in full or in part, except such as . . . (7) are for alimony due or to become due, or for maintenance or support of wife or child . . ..'See generally, 1A Collier on Bankruptcy P17.19 (14 ed. 1975).
 
 
 9
 RCW 74.20A.030, the principal statute upon which the Department's claim rests, read as follows at the time this action was instituted:
 
 
 10
 'Any payment of public assistance money made to or for the benefit of any dependent child or children creates a debt due and owing to the department by the natural or adoptive parent or parents who are responsible for support of such children in an amount equal to the amount of public assistance money so paid: Provided, that where there has been a superior court order or final decree of divorce, the debt shall be limited to the amount of said court order or decree. The department shall have the right to petition the appropriate superior court for modification of a superior court order on the same grounds as either party to said cause.
 
 
 11
 'The department shall be subrogated to the right of said child or children or person having the care, custody, and control of said child or children to prosecute or maintain any support action or execute any administrative remedy existing under the laws of the state of Washington to obtain reimbursement of moneys thus expended. If a superior court order or final decree of divorce enters judgment for an amount of support to be paid by an obligor parent, the department shall be subrogated to the debt created by such order, and said money judgment shall be deemed to be in favor of the department.'
 
 
 12
 This and companion statutes[3] were enacted in response to new requirements placed upon states participating in the AFDC program, 42 U.S.C. § 601 et seq., by the Social Security Amendments of 1967, Pub.L. No. 90--248, 81 Stat. 821 (Jan. 2, 1968). The modus operandi of that program, designed to meet the needs of minor children in families without a breadwinner, was outlined by the Supreme Court in King v. Smith, 392 U.S. 309, 316--18, 88 S.Ct. 2128, 2133--34, 20 L.Ed.2d 1118 (1968) (Warren, C.J.) (citations omitted):
 
 
 13
 'The AFDC program is based on a scheme of cooperative federalism. . . . It is financed largely by the Federal Government, on a matching fund basis, and is administered by the States. States are not required to participate in the program, but those which desire to take advantage of the substantial federal funds available for distribution to needy children are required to submit an AFDC plan for the approval of the Secretary of Health, Education, and Welfare (HEW). . . .
 
 
 14
 The plan must conform with several requirements of the Social Security Act and with rules and regulations promulgated by HEW. . . .
 
 
 15
 'One of the statutory requirements is that 'aid to families with dependent children * * * shall be furnished * * *.' . . . (T)he Act clearly require(s) participating States to furnish aid to families with children who have a parent absent from the home, if such families are in other respects eligible. . . .'
 
 
 16
 '. . . There is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program. Further, there is no question that regular and actual contributions to a needy child . . . can be taken into account in determining whether the child is needy. . . .'A major purpose of the Social Security Amendments of 1967, supra, was to reduce the rapidly increasing cost of this program to taxpayers and increase the benefit of the AFDC moneys expended by spurring states' enforcement of laws requiring legally responsible parents of sufficient means to make their appropriate contribution to the support of their children. See King v. Smith, supra, at 332, 88 S.Ct. at 2141; S.Rep.No.744, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.Code Cong. & Admin.News 2834 at 2981--82, 2997--3000.[4] Among other provisions directed towards that goal,[5] § 201(a)(1)(C) mandated that participating states set up a separate agency to execute programs to establish the paternity and secure support for children born out of wedlock and
 
 
 17
 '(ii) in the case of any child receiving such (AFDC) aid who has been deserted or abandoned by his parent, to secure support for such child from such parent . . . utilizing any reciprocal arrangements adopted with other States to obtain or enforce court orders for support . . ..'
 
 
 18
 81 Stat. 878--79, 42 U.S.C. § 602(a)(17).
 
 
 19
 The Washington legislature had previously authorized the Department in RCW 74.20.040 (1963), as amended, RCW 74.20.040 (Supp.1974), to enforce child-support obligations on behalf of applicants for public assistance, but redoubled its enforcement efforts in response to the 1968 federal amendments by enacting the recoupment statutes at issue, RCW Chapter 74.20A.[6] While the Congressional Conference Committee had deleted Senate provisions which would have required state plans to include sections under which a deserting parent could have become liable to the United States for the federal share of AFDC payments for his children, Conference Rep.No.1030, Amendment No. 223, 90th Cong., 1st Sess. (1967), 1967 U.S.Code Cong. & Admin.News at 3208, the 1967 amendments did not preclude states from creating a similar liability for AFDC moneys expended.[7] In fact, subsequent to appellee's filing in bankruptcy, Congress enacted the Social Services Amendments of 1974, Pub.L. No. 63--647, 88 Stat. 2337 (93rd Cong., 2d Sess. 1974), § 460(c)(5) of which sets forth that state plans must provide that each applicant or recipient of AFDC aid, as a condition of eligibility therefor,
 
 
 20
 '. . . assign to the State any rights to support from any other person such applicant may have (i) in his own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid, and (ii) which have accrued at the time such assignment is executed . . ..'
 
 
 21
 88 Stat. 2359, 42 U.S.C. § 602(a)(26).
 
 Section 456(b) specifies that
 
 22
 '(a) debt which is a child support obligation assigned to a State under (42 U.S.C. § 602(a)(26)) is not released by a discharge in bankruptcy under the Bankruptcy Act.'
 
 
 23
 88 Stat. 2356. Although this amendment, effective July 1, 1975, should control future actions under state statutes seeking to collect accrued unpaid child support, it is not dispositive of this appeal. However, the decision we reach is in accord with and may properly take cognizance of this recent declaration of Congressional intent. Cf. Wetmore v. Markoe, 196 U.S. 68, 76--77, 25 S.Ct. 172, 175, 49 L.Ed. 390 (1904). For we hold that the recoupment debt created by RCW 74.20A.010 et seq. is a debt for maintenance or support exempt from discharge in bankruptcy under 11 U.S.C. § 35(a)(7).[8]
 
 
 24
 While the oft-stated purpose of the Bankruptcy Act is to give debtors a chance for a fresh start, e.g., Perez v. Campbell, 402 U.S. 637, 649, 91 S.Ct. 1704, 1710--11, 29 L.Ed.2d 233 (1971), even prior to codification of the support exemption into the Act in 32 Stat. 798, ch. 487 § 5 (Feb. 5, 1903), courts interpreted obligations to dependents as beyond its remedial purposes. In Wetmore v. Markoe, supra, 196 U.S. at 77, 25 S.Ct. at 176, the Supreme Court declared that
 
 
 25
 '(u)nless positively required by direct enactment the courts should not presume a design upon the part of Congress, in relieving the unfortunate debtor, to make the law a means of avoiding enforcement of the obligation, moral and legal, devolved upon the husband to support his wife and to maintain and educate his children.'
 
 
 26
 E.g., Dunbar v. Dunbar, 190 U.S. 340, 23 S.Ct. 757, 47 L.Ed. 1084 (1902); Poolman v. Poolman, 289 F.2d 332, 335 (8th Cir. 1961); In re Hubbard, 98 F. 710 (N.D.Ill.1899).
 
 
 27
 The bankrupt and the opinion of the Referee in Bankruptcy adopted by the district court argue essentially that the State of Washington has attempted to invest itself with the character and quality of the children's relationship to the bankrupt 'statutory fiat,' and that the true origin of the recoupment debt is the independent obligation of the Department to provide AFDC payments to all eligible individuals rather than the bankrupt's obligation to provide support. E.g., Hilliard v. De Ciuceis, 202 Misc. 197, 115 N.Y.S.2d 5, 6 (Sup.Ct.1952):
 
 
 28
 'The funds provided . . . by the welfare authorities were not provided in lieu of the bankrupt's obligation to support them. They were provided because these people, quite independent of their relationship to the debtor, were in need. The same funds would have been supplied to the same people from the same source if the judgment debtor were dead or under no obligation to support them. The funds are recoverable from the debtor because the Social Welfare Law so provides, doubtless due to the fact that had he been able to support them, he rather than the state would have been required to support them. The debt was not created to relieve the debtor of his obligation but only because the authorities deemed that it is impossible for him to meet it.'
 
 
 29
 We disagree. A debt's underlying nature, rather than its form, is the central concern in determining whether it is discharged. Cf. Pepper v. Litton, 308 U.S. 295, 305--06, 60 S.Ct. 238, 244--45, 84 L.Ed. 281 (1939); Martin v. Rosenbaum, 329 F.2d 817, 820 (9th Cir. 1964); Poolman v. Poolman, supra. The Department's duty to provide $1,864.80 in AFDC funds for the support of the bankrupt's minor children did not arise in a vacuum. 42 U.S.C. § 602(a)(7) requires state agencies determining need and eligibility for AFDC support to
 
 
 30
 '. . . take into consideration any other income and resources of any child or relative claiming aid to families with dependent children . . .'
 
 
 31
 Had the bankrupt met his common law and statutory support obligation[9] reflected in the divorce court's support order, the need of his offspring and the level of AFDC payments which the Department was obligated to make to those dependents would have been correspondingly reduced. See King v. Smith, supra, 392 U.S. at 319--20, 88 S.Ct. at 2134--35. Therefore, the Department's payments, while mandated by statute and regulations, were substantially in lieu of the bankrupt's support obligations.
 
 
 32
 The fact that the funds recovered flow to state and federal treasuries[10] rather than directly to the bankrupt's children does not alter their character as obligations for maintenance or support. Under RCW 74.20A.030 the Department is 'subrogated' to the welfare recipients' right to support. That doctrine of subrogation results in a '. . . shift of the original debt from the creditor to the (subrogee) who steps into the creditor's shoes.' Putnam v. Commissioner of Internal Revenue, 352 U.S. 82, 85, 77 S.Ct. 175, 176, 1 L.Ed.2d 144 (1956). E.g., Compania Anonima Venezolana de Nav. v. A. J. Perez Exp. Co., 303 F.2d 692, 696 (5th Cir. 1962); Allen v. See, 196 F.2d 608, 610 (10th Cir. 1952). As such, the debt to the Department is not a debt different than the bankrupt's obligation to his dependents although it is payable to a different party.
 
 
 33
 Even if the Department is not viewed as standing squarely in the shoes of its welfare-recipient subrogors, third parties have been permitted to collect what were characterized as support obligations in other contexts. E.g., Jones v. Tyson, 518 F.2d 678 (9th Cir. 1975); In re Meyers, 12 F.2d 938 (W.D.N.Y.1926); Leib v. Auerbach, 10 N.J.Super. 391, 76 A.2d 726 (1950); Krupp v. Felter, 191 Misc. 726, 77 N.Y.S.2d 665 (Sup.Ct.1948). The rationales of these and other decisions interpreting 11 U.S.C. § 35(a)(7) vary widely.
 
 
 34
 Those cases allowing third parties who provide essential support to abandoned dependents to maintain their claims after bankruptcy make a reasonable accommodation between the divergent policies behind the exemption for maintenance or support, foreshadowed in Wetmore v. Markoe, supra, and the principle that all provable debts are generally discharged.
 
 
 35
 In the absence of controlling case authority or conclusive legislative history, policy considerations are of substantial import to our determination. The bankrupt contends that a common pragmatic thread runs through all the cases which have refused to discharge support-related obligations owing to third parties--that the dependents were threatened with actual deprivation of support if discharge were granted, because the third party claimant either was custodian of the dependents or had supplied them with goods in which he retained a security interest. Certainly, the prospect of an immediate impact upon the dependents is an important factor to be weighed in construing the scope of the statutory exemption for support obligations. However, actual deprivation was not a risk in the circumstances of In re Meyers, supra, where the third party claimant by the time of the filing in bankruptcy had ceased to provide nursing care to the bankrupt's abandoned wife. Moreover, the purposes of the maintenance or support exemption would be ill-served by the result sought by the bankrupt, which would jeopardize the continuing viability of the AFDC program[11] and at the same time give tacit encouragement to parents who seek to avoid their duty to support their dependents.[12] See 53 Colum.L.Rev. 570 (1953), criticizing the result reached in Hilliard v. De Ciuceis, supra. In light of state and federal lawmakers' serious concern over the current and projected costs of the AFDC program traceable in part to family breakup, and the states' power to determine the level of benefits to provide and standards of need, King v. Smith,supra, there is a direct and substantial link between the collection of child support arrearages and the continuing provision of meaningful aid to a large class of particularly needy children.[13]
 
 
 36
 We hold, therefore, that RCW 74.20A.010 et seq.'s recoupment debt is essentially an obligation for maintenance or support exempt from discharge in bankruptcy under 11 U.S.C. § 35(a)(7). The judgment of the district court requiring repayment of $397.81 to the bankrupt and enjoining further attempts to enforce the debt for the balance of the child support arrearages outstanding is reversed, and the trial court is directed to enter judgment in accordance with this opinion.
 
 
 
 *
 Honorable Malcolm M. Lucas, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 RCW Chapter 74.20A, enacted by (Wash.) Laws of 1971, Ex.Sess., ch. 164, was amended by Laws of 1973, 1st Ex.Sess., ch. 183, effective April 25, 1973. Those amendments did not alter RCW 74.20A.010's declaration of purpose or the basic provisions creating a debt to the Department for unpaid child support. Since the petition as well as the March 9, 1973 order of the Referee in Bankruptcy were filed before these amendments became effective, hereafter citation of sections within RCW Chapter 74.20A shall be to those sections as they existed prior to their amendment in 1973
 
 
 [2]
 A detailed Supremacy Clause analysis is unnecessary. Under Perez v. Campbell, 402 U.S. 637, 653, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971), even if its purpose was to maintain a viable AFDC program rather than to circumvent the Bankruptcy Act, '. . . any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause.' RCW Chapter 74.20A does not prescribe whether the recoupment debt it creates is dischargeable in bankruptcy. However, given the declaration in RCW 74.20A.010, infra at note 6, that subsequent sections be construed so as to relieve taxpayers of part of the burden of welfare programs, we might infer an intent that the recoupment debt be nondischargeable. Washington's statutes therefore do not conflict with the impact of the construction of 11 U.S.C. § 35(a)(7) adopted infra
 
 
 [3]
 Other sections within RCW Chapter 74.20A provide for service of notice of the child support debt upon the obligor, RCW 74.20A.040, assertion and perfection of a lien upon the debtor's personal and real property, RCW 74.20A.060--080, and garnishment of 50% of the debtor's disposable earnings RCW 74.20A.090 et seq
 
 
 [4]
 The section of the Senate Finance Committee's report on the AFDC amendments opens with the following statement:
 'Like the Committee on Ways and Means of the House, this committee has become concerned about the continued growth in the number of families receiving aid to families with dependent children (AFDC). In the last 10 years, the program has grown from 646,000 families that included 2.4 million recipients to 1.2 million families and nearly 5 million recipients. Moreover, according to estimates of the Department of Health, Education and Welfare, the annual amount of Federal funds allocated to this program will increase greatly (from $1.46 billion to $1.84 billion) over the next 5 years unless constructive and concerted action is taken now to deal with the basic causes of the anticipated growth. Although the growth which has occurred can be accounted for, in part, by the inclusion in the program of assistance to the children of the unemployed (added in 1961 on an optional basis to the States) and to increases in the child population, a very large share of the program growth is due to family breakup and births out of wedlock.
 'We are very deeply concerned that such a large number of families have not achieved and maintained independence and self-support, and are very greatly concerned over the rapidly increasing costs to the taxpayers. Moreover, we are aware that the growth in this program has received increasingly critical public attention.'
 1967 U.S.Code & Admin.News at 2981.
 
 
 [5]
 Section 211(a) made the Social Security Index available to state support enforcement agencies, who are to report at least quarterly to the Secretary of HEW on progress, or lack thereof, in locating nonsupporting parents and enforcing orders for support. 42 U.S.C. § 602(a)(21). Section 211(b) gives those agencies access to the Internal Revenue Service master file under stated conditions. 42 U.S.C. § 610(a). Provision was also made for financial help with AFDC funds to court and prosecuting agencies participating in the enforcement effort, 42 U.S.C. § 602(a)(18), as well as for interstate cooperation in locating absent parents and securing compliance with support orders. 42 U.S.C. § 602(a)(22)
 
 
 [6]
 RCW 74.20A.010's declaration of the purpose of that new chapter states in part:
 'Common law and statutory procedures governing the remedies for enforcement of support for financially dependent minor children by responsible parents have not proven sufficiently effective or efficient to cope with the increasing incidence of financial dependency. The increasing workload of courts, prosecuting attorneys, and the attorney general has made such remedies uncertain, slow and inadequate, thereby resulting in a growing burden on the financial resources of the state . . .. In order to render resources more immediately available to meet the needs of minor children, it is the legislative intent that the remedies herein provided are in addition to, and not in lieu of, existing law. It is declared to be the public policy of this state that this chapter be construed and administered to the end that children shall be maintained from the resources of responsible parents, thereby relieving, at least in part, the burden presently borne by the general citizenry through welfare programs.'
 RCW 74.20.040 was also amended to allow the Department to accept applications for support enforcement services on behalf of persons who are not recipients of public assistance, and to adopt reasonable standards to limit such applications and fee schedules for such services. Laws of 1971, Ex.Sess., ch. 213, § 1, as amended, RCW 74.20.040 (Supp.1974).
 
 
 [7]
 RCW Chapter 74.20A does not explain how the funds recovered are to be disbursed. Reply Brief for Appellant at 11 states that child-support payments received by the Department are placed in state and federal treasuries in proportion to the matching fund formula. These payments apparently include current support payments assigned to the Department for collection by AFDC families who then receive aid payments without a reduction or offset for that other source of support. A sharing of amounts collected is dictated by formulas set out in § 457 of the 1974 amendments, 88 Stat. 2356. The federal matching funds for Washington's AFDC program are approximately 53% according to Wash. Dept. of Social and Health Services, Public Assistance in the State of Washington, Vol. 27, No. 3, Sept. 1973, at IV
 
 
 [8]
 A similar result was reached in a well-reasoned unreported district court opinion, In re Rivard, No. 73--729--HL--F (D.Mass., Nov. 19, 1974) (Freedman, D.J.). Lower federal and state court decisions to the contrary include In re Kiluk, CCH Bankruptcy Law Rep. P65,681 (D.Conn.1975) (Trevethan, B.J.); In re Ashby, CCH Bankruptcy Law Rep. P65, 100 (W.D.Mich.1973) (Nims, B.J.); Lasher v. McIntyre, 62 Misc.2d 662, 309 N.Y.S.2d 960 (Fam.Ct.1970); Hilliard v. De Ciuceis, 202 Misc. 197, 115 N.Y.S.2d 5 (Sup.Ct.1952)
 
 
 [9]
 In the State of Washington, a parent's duty to support has been recognized at common law and is the subject of numerous statutes in addition to RCW Chapter 74.20A. See, e.g., State v. Russell, 68 Wash.2d 748, 415 P.2d 503 (1966); State v. Williams, 4 Wash.App. 908, 484 P.2d 1167, 1170--71 (1971); RCW 26.16.205; RCW 26.20.030 et seq.; RCW 26.21.010 et seq
 
 
 [10]
 See note 7, supra
 
 
 [11]
 See note 4 and text accompanying, supra
 
 
 [12]
 If the recoupment debt is discharged, the Department would be deprived of the most direct method of collecting arrearages from the bankrupt, and the bankrupt may well avoid enforcement of such accrued support obligations entirely. Reply Brief of Appellant at 9--10 argues that if the Department cannot collect those arrearages, the bankrupt's dependents could still maintain an action for the unpaid support, but that recipients of public assistance are not likely to have the resources necessary to pursue that type of action. Even if, as Appellee's Brief at 2 asserts, as fact, the dependents are no longer recipients of welfare, they might be able to qualify for the Department's support enforcement services. See note 6 supra. Whatever the merits of such possible litigation, the dependents' motivation to sue would certainly suffer if any sums collected became subject to a claim by the Department to the extent of prior AFDC payments offsetting the lack of support from the bankrupt or led to a recomputation of present need
 
 
 [13]
 The bankrupt raises the spectre that non-dischargeability would frustrate rather than effectuate the state's interest in assuring support for his dependents, since the Department would be competing with his old and new families for a share of his relatively meager earnings. Considering the bankrupt's history of non-payment of the court-ordered support, we will not presume that the self-sufficiency of both families would be maximized by discharge of the recoupment debt. The Department's professed policy of seeking voluntary support agreements which reflect the parent's ability to pay should, if carried out in good faith, furnish enough flexibility to minimize any hardship from the simultaneous collection of past-due and present support obligations. The burdensomeness of an obligation need not affect whether it falls within an exemption from discharge, Poolman v. Poolman, supra, 289 F.2d at 335, particularly when it is caused by the bankrupt's failure to meet his obligations as they become due rather than external factors. Any hardship imposed upon the bankrupt and his new family will be no greater than that which would result if the dependents by his first marriage were themselves pursuing an action to collect the support arrearages